[No. A120378. First Dist., Div. Three. Apr. 28, 2009.]

BRIAN P. BURNS, Plaintiff and Appellant, v.
THE NEIMAN MARCUS GROUP, INC., Defendant and Respondent.

## COUNSEL

Zelle, Hofmann, Voelbel, Mason & Gette, Daniel S. Mason and Patrick B. Clayton for Plaintiff and Appellant.

Tucker Ellis & West, Jean A. Hobart, Rebecca A. Lefler and Irene Keyse-Walker for Defendant and Respondent.

## OPINION

**JENKINS, J.**—Plaintiff Brian P. Burns appeals from a judgment in favor of defendant The Neiman Marcus Group, Inc. (Neiman Marcus), after its general demurrer to the second amended complaint was sustained without leave to amend. Plaintiff seeks to recover damages arising from an employee's fraudulent use of checks drawn on his personal checking account to make payments on the employee's Neiman Marcus store credit card accounts. Plaintiff argues that he has alleged sufficient facts requiring the reinstatement of his causes of action for common law negligence or, in the alternative, a statutory cause of action pursuant to California Uniform Commercial Code,

section 3406, subdivision (b),[1] and a related request for an accounting. We disagree and, accordingly, affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

As more fully set forth in the operative complaint, plaintiff alleges that Carol Young[3] was employed as plaintiff's secretary, and throughout the relevant time period, her base salary never exceeded the sum of $75,000. Between 1995 and 2000, Young opened several credit card accounts with Neiman Marcus. In the three-year period prior to 2006, Young spent approximately $1 million at Neiman Marcus, and "the balance on [one] credit card, as of January 10, 2006, is and was in excess of $242,000." "As a result of her purchasing volume, [Young] was offered entree into [Neiman Marcus's] exclusive INCIRCLE® rewards program—a loyalty incentive program offered only to [Neiman Marcus's] most frequent and highest spending customers." Young was also provided a designated sales associate, or a personal shopper, whose compensation was allegedly tied to the volume and price of the merchandise purchased by her clients.

According to plaintiff, Young "did not earn a sufficient salary from her employment to merit the excessive credit limits provided to her by [Neiman Marcus]." Young's personal shopper is alleged to have known that plaintiff's annual salary was less than $75,000, and that Young's huge purchases were well beyond what her financial condition would justify and support. Despite this knowledge, the personal shopper "repeatedly contacted and encouraged [Young] to make excessive purchases with her various [Neiman Marcus] cards."

The complaint describes the transactions giving rise to plaintiff's negligence claim as follows. "Starting at least as early as 1995, . . . [Young] began paying for all her purchases at [Neiman Marcus] by means of unauthorized checks drawn on the personal bank account of [plaintiff]. [Young] would personally deliver on a regular basis, fraudulent and forged checks clearly identified as being drawn on [p]laintiff's Union Bank of California checking account to pay down her various [Neiman Marcus] credit card bills at the Customer Service Center in [Neiman Marcus's] San Francisco store."[4]

---

[1] Further unspecified statutory references are to the California Uniform Commercial Code.

[2] Because plaintiff's action was resolved by demurrer, we set forth the facts as alleged in the second amended complaint, the operative pleading. (*Shvarts v. Budget Group, Inc.* (2000) 81 Cal.App.4th 1153, 1156 [97 Cal.Rptr.2d 722].)

[3] Young was not identified by name in the initial complaint, but she is so identified in the second amended complaint.

[4] In the complaint, plaintiff proffered the following examples of Young's conduct: "[O]n January 5, 2006, [Young] made a payment in the amount of $13,898.72 on her [Neiman

Neiman Marcus presented the fraudulent and forged checks for payment and received funds from plaintiff's personal checking account.

According to plaintiff, "Young employed at various times, at least three different methods of fraudulently presenting [p]laintiff's checks for payment of her personal [Neiman Marcus] credit card accounts: [¶] (a) by theft of [p]laintiff's checks and the forging of [p]laintiff's signature thereon; (b) by theft of [p]laintiff's checks with no signature whatsoever; and (c) by theft of [p]laintiff's checks with [p]laintiff's signature presumed by plaintiff to be for payment towards [p]laintiff's own [Neiman Marcus store] credit card account, but which was diverted by [Young] for payment towards [Young's] personal [Neiman Marcus] credit card account(s)."

Plaintiff alleged that he was not aware of Young's unauthorized activity for the following reasons. "[W]hen [Young] received [p]laintiff's bank statements, she would destroy the checks reflecting the payments made to her [Neiman Marcus] credit card accounts. She would then alter [p]laintiff's ledger account records to reflect payments made to third parties other than [Neiman Marcus] to account for the missing money." Plaintiff did not learn of the actions of Young and Neiman Marcus until April 2006.

The second amended complaint contains four causes of action, only two of which are at issue on this appeal.[5] The first cause of action is labeled "Negligence—Breach of Ordinary Care, Commercial Code §§ 3103(a)(7) and 3406(b)." The second cause of action is labeled "Negligence—Breach of Ordinary Care, Commercial Code §§ 3103(a)(7) and 3405(b)." Despite the reference to the California Uniform Commercial Code sections in the titles of the two causes of action, both are based on a claim of common law negligence.

As to both causes of action, plaintiff alleges that "with respect to the business of luxury retailing in which [Neiman Marcus] is engaged, there is a prevailing, reasonable commercial standard to observe the practice of taking additional steps when presented with third-party checks so to prevent the unauthorized use of the third-party's checking account, and to prevent the harm that would result to the third party from such unauthorized activity."

Marcus] account with [plaintiff's] personal check . . . upon which his signature had been forged. Subsequently, [Young] returned to [Neiman Marcus's] San Francisco store on January 6, 2006, and made another payment on her [Neiman Marcus] credit card account in the amount of $9,486.85 using another forged check bearing [plaintiff's] name. . . ."

[5] The second amended complaint also alleges causes of action for conversion and for an accounting. On appeal, plaintiff does not seek to reinstate his conversion cause of action and acknowledges that the request for an accounting is dependent on the sufficiency of the negligence claims.

"Based on all the circumstances as set forth above, when confronted with the unusual habit of [Young] in paying down her massive [Neiman Marcus] credit card debt in person, by third-party checks drawn on the personal account of [p]laintiff, [Neiman Marcus] owed a duty of ordinary care to [p]laintiff to ascertain whether [Young] was authorized to take such actions, or, at the least, to alert [p]laintiff of [Young's] practice." "[D]espite having a duty to do so, and upon information and belief a policy requiring it, no one in [Neiman Marcus's] Customer Service Center ever asked [Young]: (i) why she was paying with [plaintiff's] checks and/or (ii) whether she had authority to make payments to her account with [plaintiff's] funds. Further, no one from [Neiman Marcus] ever contacted [plaintiff] to ascertain whether [Young] had authority to pay her [Neiman Marcus] credit card account with checks drawn on his personal . . . checking account or even alerted [plaintiff] that such payments were being made from his personal checking account." According to plaintiff, Neiman Marcus knew, should have known, or acted with reckless disregard of facts showing that Young was not authorized to pay her credit card bills with checks drawn on plaintiff's personal checking account because the store knew that Young was charging large monetary amounts that exceeded her monthly income, and the store's employees failed to ask Young whether she had authority to pay her bills with plaintiff's personal checks and failed to alert plaintiff that Young was using his personal checks to pay her credit card bills. "As a direct result of [Neiman Marcus's] failure to exercise that degree of ordinary care found in the retail industry in circumstances such as these with respect to the acceptance and processing of credit card payments, as well as [Neiman Marcus's] failure to follow its own corporate procedure with respect to payment on credit card accounts using third-party checks, [Neiman Marcus] failed to observe ordinary care in taking the checks," resulting in a loss to plaintiff exceeding $100,000.[6]

In sustaining Neiman Marcus's general demurrer to the second amended complaint, the trial court ruled as follows: "The [demurrer to the] first cause of action for negligence under [California Uniform] Commercial Code Section[s] 3103(a)(7) and 3406(b) is sustained without leave to amend. The text and official comments for Section 3406(b) make it clear that section does not create a cause of action, but allows for a defense of comparative

---

[6] Under the first cause of action, citing to sections 3103, subdivision (a)(7) and 3406, subdivision (b), plaintiff sought to recover for Neiman Marcus's acceptance of checks that Young acquired "by theft of [p]laintiff's checks and the forging of [p]laintiff's signature thereto, and by theft of [p]laintiff's checks with no signature whatsoever." Under the second cause of action, citing to sections 3103, subdivision (a)(7), and 3405, subdivision (b), plaintiff sought to recover for Neiman Marcus's acceptance of checks involving payments on Young's credit card accounts "by theft of [p]laintiff's checks with [p]laintiff's signature presumed by [p]laintiff to be for payment toward [his] own [Neiman Marcus] credit card account, but which w[ere] diverted by [Young] for payment toward [Young's] personal [Neiman Marcus] credit card account(s)."

negligence. Section 3103(a)(7) provides the definition for ordinary care, but this section does not create a negligence claim. Plaintiff relies on *Sun 'N Sand[, Inc. v. United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920]], and *Joffe* [*v. United California Bank* (1983) 141 Cal.App.3d 541 [190 Cal.Rptr. 443]] to support his negligence claim. . . . These cases allowed negligence claims not directly based on a [California Uniform] Commercial Code statute. In both cases, the bank cashing the check was put on notice of a potential fraud by what was on the face of the check and in what account the check was deposited. Here, the fact that an account payment came from a third party is not enough to put [Neiman Marcus] on notice of a potential fraud. The Court will not extend the holding of *Sun 'N Sand* and *Joffe* to the facts of this case. [¶] The [demurrer to the] second cause of action for negligence under [California Uniform] Commercial Code Section[s] 3103(a)(7) and 3405(b) is sustained without leave to amend. Section 3405(b) applies when an employee makes a fraudulent indorsement. . . . Plaintiff has alleged various situations where, he claims that the secretary used [his] checks to pay off her account with [Neiman Marcus]. None of these situations fall[s] under the definition of fraudulent indorsement as defined in Section 3405(a)(2)." A judgment of dismissal was entered from which plaintiff filed a timely notice of appeal.

## DISCUSSION

On appeal, plaintiff argues that he has alleged a cause · of action for common law negligence that is not barred by the California Uniform Commercial Code. Alternatively, he asserts if he has no common law negligence claim, he has nevertheless alleged sufficient facts to support a cause of action under section 3406, subdivision (b), for breach of the duty of "ordinary care." We conclude that plaintiffs' arguments are unavailing.

Our review of the trial court's ruling sustaining the general demurrer is de novo. We independently evaluate the complaint, construing it liberally, giving it a reasonable interpretation, reading it as a whole, and viewing its parts in context. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Treating as true all material facts properly pleaded, we determine de novo whether the factual allegations of the complaint are adequate to state a cause of action under any legal theory, regardless of the title under which the factual basis for relief is stated. (*Id.* at p. 318.) Because

plaintiff does not contend he should be allowed a further opportunity to amend the factual allegations in his latest complaint, we review whether the demurrer was well taken.[7]

### A. *Common Law Negligence Claim Does Not Lie in This Case*

" '[N]egligence is conduct which falls below the standard established by law for the protection of others.' [Citation.] 'Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself.' ([Civ. Code], § 1714, subd. (a).)" (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 396–397 [11 Cal.Rptr.2d 51, 834 P.2d 745] (*Bily*).) Related to the concept of negligence is the tort law that a person is "ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the absence of a special relationship of custody or control." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 293 [253 Cal.Rptr. 97, 763 P.2d 948].)

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court." (*Bily, supra,* 3 Cal.4th at p. 397.)

"California courts have explicitly rejected the concept of universal duty. ' " 'It must not be forgotten that "duty" got into our law for the very purpose of combatting what was then feared to be a dangerous delusion . . . viz., that the law might countenance legal redress for all foreseeable harm.' " ' [Citation.] Instead, whether to recognize a new 'legal wrong' or 'tort' is often governed by policy factors. [Citation.] In making these determinations, both the courts and the Legislature must weigh concepts of 'public policy,' as well as problems inherent in measuring loss, and 'floodgates' concerns, in addition to the traditional element of foreseeability." (*The Mega Life and Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1527 [92 Cal.Rptr.3d 399].)

In determining whether it is appropriate to impose a legal duty for which the law will authorize redress, *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*), "enumerates a number of

---

[7] Plaintiff seeks leave to amend the latest complaint only to eliminate references to the California Uniform Commercial Code in the first cause of action, not to add additional factual allegations. In light of our determination, the request to amend is moot.

considerations . . . that have been taken into account by courts ⁄in various contexts . . . : 'the major [considerations] are *the foreseeability of harm to the plaintiff*, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624] (italics added by *Ballard*) (*Ballard*), quoting *Rowland, supra*, 69 Cal.2d at p. 113.) "The foreseeability of a particular kind of harm plays a very significant role in this calculus [citation], but a court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard, supra*, 41 Cal.3d at pp. 572–573, fn. 6.)[8]   ■   In other words, "[e]xamining whether a legal duty exists and whether a particular defendant was negligent [are not] coterminus . . . . Fulfilling the court's responsibility to determine if a legal duty exists necessarily requires consideration and balancing of sometimes competing public policies which may be irrelevant to the factual determination of whether the challenged conduct fell below the prevailing standard of care." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196].)

Guided by these well-honed principles of tort law, we agree with the trial court that the focus of our analysis of duty is on the acceptance of a third party check, by a retail merchant, to pay another person's credit card account. For the reasons we will now discuss, a consideration of the *Rowland* factors leads us to conclude that a retailer merchant's acceptance of a third party check to pay another person's credit card account is not sufficiently likely to result in the kind of harm that plaintiff experienced so that liability should appropriately be imposed on Neiman Marcus in this case.

The foreseeability of harm to plaintiff, the degree of certainty that plaintiff would suffer harm, and the connection between Neiman Marcus's conduct

---

[8] As further explained by the *Ballard* court, the concept of foreseeability of risk of harm in determining whether a duty should be imposed is to be distinguished from the concept of " 'foreseeability' in two more focused, fact-specific settings" to be resolved by a trier of fact. (*Ballard, supra*, 41 Cal.3d at p. 573, fn. 6.) "First, the [trier of fact] may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the [trier of fact's] determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ibid.*)

and the injury plaintiff suffered, all weigh in favor of not imposing a duty on the retail merchant in this case. Plaintiff contends that Neiman Marcus owed him a duty to inquire before it accepted his checks because the following circumstances should have alerted the store to a potential fraud: Young made numerous and frequent purchases in relation to her known limited income; Young's personal shopper encouraged purchases beyond Young's financial means; and Young personally delivered checks to the store, sometimes on successive days, and the checks were drawn on plaintiff's personal bank account, and not a corporate account. But, plaintiff's contention—that Neiman Marcus's conduct of ignoring " 'red flags' " occasioned by Young's unusual conduct in using plaintiff's checks—improperly frames the relevant inquiry regarding the question of whether a legal duty of inquiry exists. Plaintiff's factual allegations regarding Neiman Marcus's conduct, which are extrinsic to the presentation of the checks, concern the fact-specific concept of foreseeability that would be considered by a trier of fact *after* a determination by a court that a duty of inquiry exists.[9] His argument also ignores that, for Neiman Marcus to foresee injury to him, it would have to foresee that any unauthorized checks "would go undetected for long enough that the drawer bank could escape responsibility" to plaintiff for the payment of those checks. (*Simmons v. Lennon* (2001) 139 Md.App. 15, 42 [773 A.2d 1064].) To accept plaintiff's argument would stretch the concept of foreseeability of harm in determining duty beyond recognition.

Even assuming the *Rowland* foreseeability of harm factor in determining duty properly includes the "red flags" alleged by plaintiff, the other *Rowland* factors militate against imposing a new duty of inquiry on the retail merchant. Specifically, the policy of preventing future harm and the burden to the defendant and consequences to the community do not weigh in favor of imposing a duty of inquiry in this case. Regardless of the internal policies that a merchant might have in place to verify third party checks, there are

---

[9] Indeed, our dissenting colleague concedes as much because he does not "suggest that under all circumstances a duty of inquiry arises upon the presentation of a third party check." (Dis. opn., *post*, at p. 503.) Instead, he argues, "That the check is presented by one who is neither the maker nor the payee is indeed one important factor that must be considered. However, the amended complaint alleges numerous additional circumstances that a reasonable fact finder could find would alert a reasonable person to the likelihood that Young had no right to apply the third party checks to her personal account." (*Ibid.*) After numerating the additional circumstances, he then concludes that "[w]hether these circumstances were sufficient to cause a reasonable person to question Young's right to apply plaintiff's personal checks to the payment of her own obligations is a question of fact that plaintiff is entitled to have a jury determine." (*Ibid.*, fn. omitted.) However, the argument misconstrues our task—as mandated by *Ballard*—that in determining duty, we are not to decide "whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct." (*Ballard, supra*, 41 Cal.3d at p. 573, fn. 6.) Rather, our determination of whether a legal duty of inquiry exists *must precede* any determination by the jury as to Neiman Marcus's liability for a breach of that duty.

practical problems with imposing a duty of inquiry on a retail merchant before he can accept a person's payment for goods and services. Because the retail merchant could not rely upon anything told to him by the person tendering the third party check, the presumed wrongdoer—in the usual situation, a retail merchant—would have to stop his business every time he received such a check in order to make an *independent* inquiry of the drawer. Assuming the retail merchant could readily locate the drawer of the check, he would then have to ascertain what would constitute a reasonable inquiry so as to avoid liability. Would one or two attempts to reach the drawer by telephone be sufficient; or would a letter have to be written? The scope of this proposed—yet ill-defined—duty of inquiry is boundless, and would impose a significant and unwarranted burden on retail merchants to ascertain the veracity of a third party check any time the instrument is proffered in payment for goods and services, which would far outweigh any resulting benefit in detecting the isolated instance of embezzlement. (See *Gino's of Capri v. Chem. Bank* (N.Y.App.Div. 1993) 187 A.D.2d 71, 75 [592 N.Y.S.2d 682] (*Gino's of Capri*).)[10]

In considering the other *Rowland* factors, we note that plaintiff has apparently suffered great monetary losses as a consequence of Young's misconduct. Nevertheless, the person deserving of moral blame is Young, not Neiman Marcus. There is no allegation that Neiman Marcus actively participated in Young's alleged embezzlement of funds from plaintiff. Also, our rejection of plaintiff's invitation to impose a duty of inquiry on Neiman Marcus under the circumstances of this case "assigns losses by the relative responsibility of the parties, allocating liability to the party best able to prevent them." (*Hartford v. American Express* (1989) 74 N.Y.2d 153, 165 [544 N.Y.S.2d 573, 542 N.E.2d 1090] (*Hartford*).) The retail merchant's acceptance of a check for payment of goods and services is not risk free. "[A] check is simply an order to the drawee bank to pay the sum stated, signed by the maker and payable on demand." (*Barnhill v. Johnson* (1992) 503 U.S. 393, 398 [118 L.Ed.2d 39, 112 S.Ct. 1386]; see §§ 3103, subd. (a)(3), 3104, subd. (f), 3108.) The store "may present the check, but, if the drawee bank refuses to honor it," the store may not receive payment. (*Barnhill v. Johnson, supra*, 503 U.S. at p. 398; see § 3409, subd. (a).) And, under the circumstances here, Neiman Marcus's legal recourse would be only against its customer Young, and not plaintiff who was not legally responsible for Young's store credit card charges. Alternatively, however, if the drawer's

---

[10] Thus, we cannot agree with our dissenting colleague that a retail merchant's duty of inquiry could be " 'narrowly circumscribed,' " and " 'minimal.' " (Dis. opn., *post*, at p. 501.) He suggests a number of ways that the merchant might meet this proposed duty, including an explanation from the person presenting the check, i.e., the purported defrauder. (*Ibid.*) He then contends that whether the steps taken are reasonable may well be a jury question. (*Ibid.*) However, in balancing the *Rowland* factors, we see no basis to impose a duty of inquiry whose scope is to be determined as a question of fact by a jury.

bank pays an unauthorized check, the bank's liability to the drawer "is absolute; that is, [liability is imposed] without regard to whether the bank exercised due care or was negligent or worse." (*Roy Supply, Inc. v. Wells Fargo Bank* (1995) 39 Cal.App.4th 1051, 1062 [46 Cal.Rptr.2d 309] (*Roy Supply*).) Plaintiff, as a bank customer acting in a timely manner, could have recovered any losses incurred as a consequence of his bank's payment of any check on an altered, forged, or missing signature. (*Id.* at pp. 1062–1064.)[11] Plaintiff's failure to detect Young's alleged embezzlement within the statute of limitations timeframe should not be the impetus for imposing liability on other persons in the chain of custody of the checks. To the extent plaintiff alleges that Young used some of his checks to pay her store credit card accounts that were intended to be applied to plaintiff's store credit card account, any loss is appropriately attributed to plaintiff. "As among the parties to this dispute [plaintiff]—whose misplaced trust or inattention enabled [Young] to misappropriate funds, undetected, for several years—was plainly the party best able to prevent the losses and to protect [himself] by insurance." (*Hartford, supra,* 74 N.Y.2d at p. 165.) "Had plaintiff properly reviewed [his bank] statements" and store credit card statements over the 12 years, he "would, of course, have realized that [his] checks were being diverted." (*Gino's of Capri, supra,* 187 A.D.2d at p. 76.) "While that may well have been the faithless [Young's] obligation, which, for obvious reasons, [she] would not have diligently performed, the loss ensuing from such failure cannot be shifted to [Neiman Marcus]." (*Ibid.*)

Finally, we reject plaintiff's argument that Neiman Marcus has a duty of inquiry based on *Sun 'n Sand, Inc. v. United California Bank, supra,* 21 Cal.3d 671 (*Sun 'n Sand*), and its progeny, including *Joffe v. United California Bank, supra,* 141 Cal.App.3d 541 (*Joffe*), and *E. F. Hutton & Co. v. City National Bank* (1983) 149 Cal.App.3d 60, 67–68 [196 Cal.Rptr. 614]. At issue in *Sun 'n Sand* was "a variation of the recurring theme . . . of the rights of an employer to recover funds embezzled by a faithless employee through the manipulation of company checks." (21 Cal.3d at p. 678, citation omitted.) In *Sun 'n Sand,* the court upheld the employer's cause of action against the bank on a theory of negligence, imposing upon the bank a "narrowly circumscribed" duty "activated only when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." (*Id.* at p. 695.)

---

[11] "Section 4406 imposes a duty upon a customer to act promptly in discovering and reporting forgeries and alterations [of checks]. If the customer fails to fulfill this duty then [his] bank is relieved from absolute liability and for an initial one-year period the loss may be imposed upon the bank only if it was negligent in the matter. After one year the statute bars the customer from asserting a forgery or alteration against [his] bank unless it has been earlier discovered and reported to the bank." (*Roy Supply, supra,* 39 Cal.App.4th at p. 1065.)

Significant to our analysis here, in *Sun 'n Sand*, there was no discernable reason for the bank's action in allowing checks, payable to the bank, to be deposited into the employee's personal account. In this case, we are presented with Neiman Marcus's acceptance of third party checks, payable to Neiman Marcus, in satisfaction of a customer's legitimate debt to the store for the purchase of goods. The circumstances attendant to the submission of the checks here are clearly distinguishable from those present in *Sun 'n Sand*. Plaintiff alleges, however, that some of the checks diverted by Young were to be credited to his own store account. According to our dissenting colleague, Neiman Marcus could have readily determined that plaintiff was its customer and the holder of a Neiman Marcus charge account. (Dis. opn., *post*, at p. 503.) However, there is no contention that when Young proffered the checks for payment of her accounts there was anything appearing on the checks that would lead the store cashier to question whether plaintiff also had a Neiman Marcus store account. Thus, we shall not extend *Sun 'n Sand* beyond its specific facts, and accordingly, we reject plaintiff's invitation to impose a duty upon Neiman Marcus based upon *Sun 'n Sand*.[12]

In light of our determination that a negligence cause of action does not lie, we do not reach Neiman Marcus's alternative argument that a negligence cause of action is preempted by the California Uniform Commercial Code.

B. *Section 3406, Subdivision (b), Does Not Create a Cause of Action in Favor of Drawer of Fraudulently Altered or Forged Check*

■ Section 3407 allows a person who pays a fraudulently altered or forged instrument or takes such an instrument for value, in good faith and without notice of the alteration or forgery, to enforce the instrument according to the instrument's original terms.[13] "If negligence of the obligor

---

[12] Neither *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192 [79 Cal.Rptr.2d 712] *(Kane)* nor *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472 [56 Cal.Rptr.2d 756] *(Software Design)* supports the extension of the duty found in *Sun 'n Sand* to the facts alleged in this case. To the contrary, in both *Kane* and *Software Design*, the courts, consistent with our analysis here, declined to apply *Sun 'n Sand* on the records before them. *(Kane, supra,* 67 Cal.App.4th at pp. 1200–1202; *Software Design, supra,* 49 Cal.App.4th at pp. 479–481.)

[13] Section 3407 reads: "(a) 'Alteration' means (1) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party, or (2) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party. [¶] (b) Except as provided in subdivision (c), an alteration fraudulently made discharges a person whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration. No other alteration discharges a party, and the instrument may be enforced according to its original terms. [¶] (c) A payor bank or drawee paying a fraudulently altered instrument or a person taking it for value, in good faith and without notice of the alteration, may enforce rights with respect to the instrument (1) according

substantially contributes to an alteration, . . . section [3406[14]] gives the holder . . . the alternative right to treat the altered instrument as though it had been issued in the altered form." (U. Com. Code com., 23A pt. 2 West's Ann. Cal. Com. Code (2002 ed.) foll. § 3406, p. 436.) Thus, section 3406, together with section 3407, outlines the rights to enforce and collect on altered or forged checks while precluding the obligor whose negligence contributed to the alteration or forgery from asserting the alteration or forgery as a defense to payment.

■ Plaintiff contends that subdivision (b) of section 3406 creates a statutory cause of action against Neiman Marcus. We disagree. "In the construction of statutes, the primary goal of the court is to ascertain and give effect to the intent of the Legislature. [Citations.] The court looks first to the language of the statute; if clear and unambiguous, the court will give effect to its plain meaning. [Citations.] [¶] Where the court must construe the statute, it ' "turns first to the words themselves for the answer." [Citation.]' [Citation.] The words used should be given their usual, ordinary meanings and, if possible, each word and phrase should be given significance. [Citations.] The words used 'must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' " (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 223 [118 Cal.Rptr.2d 187].) "Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

■ We conclude that when section 3406, in its entirety, is carefully read, the statutory language indicates that subdivision (b), itself, does not create a cause of action. Contrary to plaintiff's contention, subdivision (b) cannot be

---

to its original terms, or (2) in the case of an incomplete instrument altered by unauthorized completion, according to its terms as completed."

[14] Section 3406 reads: "[¶] (a) A person whose failure to exercise ordinary care contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection. [¶] (b) Under subdivision (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss. [¶] (c) Under subdivision (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subdivision (b), the burden of proving failure to exercise ordinary care is on the person precluded."

read in isolation, but must be read in conjunction with subdivision (a). As noted, subdivision (a) gives a person who takes a check the right to treat a fraudulently altered or forged check as it is written if the drawer "contributes to the alteration of an instrument or to the making of a forged signature on an instrument." (§ 3406, subd. (a); see U. Com. Code com., 23A pt. 2 West's Ann. Cal. Com. Code, *supra*, foll. § 3406, p. 436.) In the absence of a claim under subdivision (a) of section 3406, subsection (b) of section 3406 is inapplicable.

Plaintiff acknowledges that the Supreme Court of Virginia, analyzing the Virginia Uniform Commercial Code sections 8.3A-406, as well as sections 8.3A-404 and 405 (its essentially identically worded versions of our §§ 3404, 3405, and 3406) declined to recognize that a drawer of a check has a statutory right of action under section 8.3A-406. (*Halifax Corporation v. Wachovia Bank* (2004) 268 Va. 641 [604 S.E.2d 403] (*Halifax*).) The Supreme Court of Virginia explained its reasons as follows: "In the first place, the term 'cause of action' or 'may recover' or anything remotely resembling either term nowhere appears in Code § 8.3A-406. And this Court cannot supply the language that would have created an affirmative cause of action under the circumstances of this case. 'Courts are not permitted to rewrite statutes. This is a legislative function. The manifest intention of the legislature, clearly disclosed by its language, must be applied. . . .' [¶] Second, Official Comment 1 to [the Uniform Commercial] Code . . . states that subsection (a) [of section 3-406] 'adopts the doctrine' that a '*drawer* who so negligently draws an instrument as to facilitate its material alteration [or its forgery] is liable to a *drawee* who pays the altered [or forged] instrument in good faith.' (Emphasis added [by *Halifax*].) But statutory language making a drawer liable to a drawee cannot possibly be taken as showing an intention to create a cause of action in favor of a drawer against a depositary bank. . . . [¶] Third, Official Comment 1 further states: 'Section 3-406 does not make the negligent party liable in tort for damages resulting from the alteration. If the negligent party is estopped from asserting the alteration the person taking the instrument is fully protected because the taker can treat the instrument as having been issued in the altered form.' We will assume Halifax is correct in saying the comment means '3-406 is not intended to make the negligent drawer subject to preclusion liable in tort.' But Halifax is incorrect in saying 'the comment shows the converse was intended, that 3-406 makes the bank liable in tort.' This is not only a non sequitor but it is also contrary to the provision in the very next sentence of the Comment, which states that 'the person taking the instrument is fully protected because the taker can treat the instrument as having been issued in the altered [or forged] form.' It is difficult to imagine how something that is designed to protect the taker can logically be turned on its head and used to create a cause of action against the taker. [¶] Finally, and of overriding importance, . . . [s]trikingly absent from

Code § 8.3A-406 is the specific language contained [elsewhere] in Code §§ 8.3A-404 and -405 that 'the person bearing the loss may recover from the person failing to exercise ordinary care.' The [Legislature] knows how to create a cause of action when that is its intention, and the omission of the 'may recover' or similar language from Code § 8.3A-406 represents an unambiguous manifestation of a contrary intention." (*Halifax, supra,* 604 S.E.2d at p. 408.)

Contrary to plaintiff's contention, the decision in *Halifax* is based on well-established principles of statutory interpretation, often applied in California courts. (See, e.g., *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 993, 999 [73 Cal.Rptr.2d 682, 953 P.2d 858]; *In re Chantal S.* (1996) 13 Cal.4th 196, 206–208 [51 Cal.Rptr.2d 866, 913 P.2d 1075].) *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353 [17 Cal.Rptr.3d 39], cited by plaintiff, is distinguishable. In *Goehring*, the statute at issue provided that a school shall make a full refund of all fees paid by students if the school did not provide the student with a required disclosure statement. (*Id.* at p. 377.) The Court of Appeal held that because the Legislature unquestionably intended to bestow students or former students with individual monetary claims by the refund language in the statute, it must have intended to give them a private right of action to pursue such claims. (*Id.* at p. 378.) Otherwise, the refund provision would be rendered nugatory. (*Id.* at p. 379.)

We conclude by noting that we are mindful that plaintiff has sustained substantial losses as a consequence of the fraud by his employee over a number of years. But, we must reject the arguments of plaintiff and our dissenting colleague to impose a duty of inquiry and the resulting liability for breach on Neiman Marcus in this case. As we have stated, the scope of this proposed—yet ill-defined—duty of inquiry is boundless, and would impose a significant and unwarranted burden on retail merchants to ascertain the veracity of third party checks received for payment of goods and services, which burden would far outweigh any resulting benefit in detecting the isolated instance of fraud.

### DISPOSITION

The judgment is affirmed. Defendant is awarded costs on appeal.

McGuiness, P. J., concurred.

**POLLAK, J.,** Dissenting.—I respectfully dissent. I agree with the majority that the amended complaint does not state a cause of action under the California Uniform Commercial Code section 3406, subdivision (b). However, plaintiff has adequately alleged a cause of action for common law

negligence. I agree with the distinction the majority recognizes between the broad foreseeability that is relevant to establish the existence of a duty and the factually specific foreseeability that may establish a breach of that duty or causation, but the distinction leads to exactly the opposite conclusion. The facts here may eventually show that Neiman Marcus committed no breach of its common law duty, or that plaintiff's claim is defeated by affirmative defenses such as comparative negligence, but they provide no principled basis for denying the existence of the duty that our Supreme Court recognized in *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920] (*Sun 'n Sand*). The fact that *Sun 'n Sand* concerned a bank while this case involves a retail merchant hardly provides an acceptable basis for recognizing a duty in one case and denying it in the other. Certainly the majority opinion points to no reason why a bank and a large retail merchant that extends credit to its customers should be treated any differently in the respect that is relevant to this case.

"The existence of a duty of care toward an interest of another worthy of legal protection is the essential prerequisite to a negligence cause of action, determined as a matter of law by the court." (*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 478 [56 Cal.Rptr.2d 756].) " ' "Duty" is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection.' " (*White v. Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 447 [30 Cal.Rptr.2d 431].) Those competing policy considerations include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561].)

Plaintiff alleges that when Young repeatedly presented Neiman Marcus with checks in large amounts drawn on plaintiff's personal checking account made payable to Neiman Marcus, for payment of Young's personal obligations on her credit card accounts, Neiman Marcus owed plaintiff the duty to inquire whether Young was authorized to apply the checks against her own obligations before accepting the checks for that purpose. In *Sun 'n Sand, supra*, 21 Cal.3d at pages 692, 694–695, the court recognized a limited "duty of inquiry" in a similar factual circumstance. In that case, an employee obtained authorized signatures on checks for small sums made payable to United California Bank (UCB) drawn on her employer's bank account. The employee then altered the checks by increasing the sums payable. Upon

presentation of the altered checks, UCB permitted the proceeds of the checks to be deposited into the employee's personal account maintained at UCB. When the fraud was discovered, the employer sued UCB for common law negligence. The employer asserted that UCB had breached its duty of care in permitting checks made payable to the bank to be deposited in the personal account of a party who was neither the drawer nor the drawee of the checks. (*Id.* at p. 692.) Applying the *Rowland* factors, the *Sun 'n Sand* court concluded that "an attempt by a third party to divert the proceeds of a check drawn payable to the order of a bank to the benefit of one other than the drawer or drawee suggests a possible misappropriation" and that "Sun 'n Sand's allegations define circumstances sufficiently suspicious that UCB should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, UCB could have discovered the fraudulent scheme and prevented its success." (*Id.* at pp. 694–695.) The court emphasized that the duty it was recognizing, though "narrowly circumscribed," is activated "when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." (*Id.* at p. 695.)

The duty recognized in *Sun 'n Sand* has been applied in subsequent cases. In *Joffe v. United California Bank* (1983) 141 Cal.App.3d 541 [190 Cal.Rptr. 443], the check in question was made payable to an investment company and the company's trust account at Wells Fargo Bank. The investment company did not deposit the check into the trust account named as a payee, but deposited it into its own account at another bank, the Bank of America. The plaintiffs sued Bank of America for negligence. Relying on the duty recognized in *Sun 'n Sand*, the court held that "[u]nder these circumstances—a check for a substantial amount, payable to an escrow, or trust, or similar entity at another bank, with inadequate indicia on the face of the check regarding the representative authorized to negotiate the instrument—. . . the risk to the drawer is sufficiently foreseeable to impose a duty on a depositary bank 'not to ignore the danger signals inherent' in an attempted negotiation by a third party." (*Id.* at p. 556.)

Similarly, in *E. F. Hutton & Co. v. City National Bank* (1983) 149 Cal.App.3d 60 [196 Cal.Rptr. 614], an employee fraudulently endorsed and deposited corporate checks payable to various payees into his personal account. The bank accepted the checks without any attempt to verify the indorsements or the employee's authority to deposit the checks into his own account. The court held that the bank had a duty of inquiry to the maker of the checks, citing the fact that the checks were in substantial amounts and were payable to payees at another bank, and bore inadequate indicia that the

employee was authorized to negotiate them. (*Id.* at p. 68.) The court quoted from *Sun 'n Sand* the admonition that a bank " 'cannot ignore the danger signals inherent in such an attempted negotiation. There must be objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed. In the absence of such indicia the bank pays at its peril.' " (*Id.* at p. 67.) Referring to the intervening decision in *Joffe v. United California Bank, supra,* 141 Cal.App.3d 541, the *E. F. Hutton* court stated, "The *Joffe* decision did not limit the negligence cause of action only to the situation where the check or checks are drawn payable to the order of a bank, and neither do we." (149 Cal.App.3d at p. 68.)

More recently, in *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138 [26 Cal.Rptr.3d 401], the court reaffirmed the continuing validity of *Sun 'n Sand.* Although affirming the general rule "under California law, [that] a bank owes no duty to nondepositors to investigate or disclose suspicious activities on the part of an account holder" (*id.* at p. 1149), the court noted, "California courts have recognized one situation in which a bank has a duty to nondepositors to investigate a suspicious banking transaction. In *Sun 'n Sand . . .* the California Supreme Court held a bank has a 'minimal' and 'narrowly circumscribed' duty of inquiry 'when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit.' " (*Id.* at p. 1151, fn. 3.) Quoting from *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 545 [71 Cal.Rptr.2d 462], still another case acknowledging the vitality of *Sun 'n Sand,* the court in *Casey* continued, " '*Sun 'n Sand* and its progeny . . . have held banks to be subject to a duty of care toward nondepositors only in narrow factual circumstances: Each case involved the bank's liability for allowing a person to deposit a check, payable to someone else, into a personal account, under circumstances that should have alerted the bank to the possibility of fraud.' " (127 Cal.App.4th at p. 1151, fn. 3, citations omitted.) In *Chazen,* the court went on to observe that "[i]t is not clear whether the decisions can be applied to other factual circumstances." (61 Cal.App.4th at p. 545.) In the case now before us, except for the fact that defendant is a large retail store that extends credit rather than a bank, the circumstances are exactly the same: the defendant "allow[ed] a person to deposit a check, payable to someone else, into a personal account, under circumstances that [allegedly] should have alerted the [defendant] to the possibility of fraud." (*Ibid.*)

In support of its contention that it was under no duty here, Neiman Marcus relies heavily on two decisions that, as the majority says (maj. opn., *ante,* p. 492, fn. 12), do not support its position. In fact, both recognize and

confirm the principle that the majority here rejects. In both *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192 [79 Cal.Rptr.2d 712] and *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., supra,* 49 Cal.App.4th 472, checks were presented by the payee of the check so that the fraud was not readily apparent from the face of the instrument and the risk of harm to the drawer was not foreseeable. In *Karen Kane,* an employee embezzled money from his employer by having the employer issue checks to fictitious payees based on falsified purchase orders. Posing as the fictitious payees, the employee cashed the checks at a check-cashing store. (67 Cal.App.4th at p. 1196.) "The checks were printed, unaltered checks which bore genuine signatures and were deliberately issued by Karen Kane in what appeared to even Karen Kane to be the regular course of business. . . . There is no claim that the checks or endorsements were forged, *or that funds were paid to other than the payees selected by Karen Kane,* albeit selected as the result of internal fraud." (*Id.* at pp. 1194–1195, italics added.) That the checks appeared to be properly payable to the person attempting to cash the checks rendered the facts "quite dissimilar" to the circumstances in *Sun 'n Sand* (*id.* at p. 1200) as they are to the facts in the present case.

Likewise, in *Software Design,* banks deposited into accounts in the name of a fictitious entity funds that a financial advisor had misappropriated from the plaintiff and transferred to the banks through brokerage accounts also in the name of the fictitious entity. (*Software Design & Application, Ltd. v. Hoefer & Arnett, Inc., supra,* 49 Cal.App.4th at pp. 480–481.) The court held that the banks did not owe plaintiff a duty of care because there were no suspicious circumstances that placed them on notice of the likelihood of fraud. The court distinguished *Sun 'n Sand* and its progeny, explaining that "[t]he danger signals triggered in these cases all stemmed from the particular circumstances of the checks, endorsements or depositors, where the person attempting to negotiate the check is not the payee. Here, no checks were presented to either bank for deposit. Rather, funds were deposited into the precise accounts to which they were directed by wire transfer. The accounts at the banks were the identified and intended destination of funds wired from the brokerage accounts . . . ." (*Ibid.*) In contrast, in the present case, the checks Young presented to Neiman Marcus for payment of her personal debt were not applied to "the precise accounts to which they were directed."[1]

---

[1] The out-of-state authorities cited by Neiman Marcus are also distinguishable. Under the state laws applicable in each case, the plaintiff was required to show that the defendant accepted a fraudulent check with actual knowledge of the fraud or in bad faith. For example, in *Watson Coatings v. American Exp. Travel* (8th Cir. 2006) 436 F.3d 1036, an employer filed an action against a credit card company under Missouri's Uniform Fiduciaries Act, which expressly " 'reliev[es] banks of their common law duty of inquiring into the propriety of each transaction conducted by a fiduciary' and . . . prevent[s] 'banks and others who typically deal with fiduciaries [from being] held liable for the fiduciary's breach of duty absent either (1) "actual knowledge" of breach or (2) knowledge of sufficient facts to constitute "bad

The factors that must be considered in determining the existence of a legal duty, as articulated in *Rowland v. Christian, supra,* 69 Cal.2d 108, were considered by the Supreme Court in *Sun 'n Sand.* Foreseeability of the risk is " 'the chief element' " (*Sun 'n Sand, supra,* 21 Cal.3d at p. 695) and the potential for fraud is apparent from the face of a check presented by one who is neither its maker nor payee. "[T]he bank is confronted with an obvious irregularity when the drawer's dishonest employee attempts to negotiate such checks for his own benefit. The bank does not have to be especially vigilant; its agent need only read what appears on the face of the check to be warned that a fraud may be in progress." (*Id.* at p. 696.) Accepting a check from one who is neither the maker nor payee creates a significant risk of financial harm to the maker if the circumstances are such that a reasonable person would suspect that the person presenting the check is not authorized to do so. When, as here, the third party checks are credited to the account of one who had no right to present them, it is certain that plaintiff suffered injury, and there unquestionably is a close connection between the acceptance of the checks and plaintiff's injury. While other factors may also have contributed to the injury, such as plaintiff's own negligence, that is a matter of defense and does not bear on the analysis of duty. Similarly, while normally there may be no moral blame in accepting a third party check, one who credits that check to the account of a person he should have suspected had no right to apply it to her own account is not blameless. After considering all of the *Rowland* factors, including the policy of preventing future harm and the consequences of imposing a duty to exercise care, the Supreme Court concluded that a duty of inquiry does arise when a bank is presented with checks naming it as the payee by a person other than the drawer who seeks to apply the check to his or her personal account. "[T]he bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed." (*Id.* at pp. 695–696.)

The bank in *Sun 'n Sand,* like Neiman Marcus and the majority here, claimed that "a duty of inquiry would be excessively burdensome and therefore should not be imposed." (*Sun 'n Sand, supra,* 21 Cal.3d at p. 695.) The Supreme Court explicitly rejected this contention. "We are not persuaded that commerce will be so impeded by a duty of inquiry in this context that we should depart from the fundamental principle that actors are liable for

faith." ' " (*Watson Coatings,* at p. 1040.) The court noted that under Missouri law "[m]ere suspicious circumstances" are insufficient to show bad faith. (*Id.* at p. 1041; see also *Hartford v. American Express* (1989) 74 N.Y.2d 153, 162 [544 N.Y.S.2d 573, 542 N.E.2d 1090] [rejecting claim against credit card company based on a non-uniform provision of the Uniform Commercial Code unique to New York and Virginia that requires a showing of bad faith "determined by a subjective test of actual knowledge rather than an objective test which might involve constructive knowledge"].)

reasonably foreseeable losses occasioned by their conduct." (*Id.* at p. 695.) The insignificance of the burden is further suggested by the allegations in the amended complaint that it is both the standard practice in the industry and Neiman Marcus's corporate policy to make an inquiry when presented with a third party check for payment on a credit card account. There is no support either in the record or in logic for the majority's assertion that recognizing a duty of inquiry would require a retail merchant "to stop his business every time he received such a check in order to make an independent inquiry of the drawer." (Maj. opn., *ante*, at p. 490, italics omitted.) As *Sun 'n Sand* pointed out, the duty is "narrowly circumscribed" and "minimal." (*Sun 'n Sand, supra,* 21 Cal.3d at p. 695.) It is triggered only by the presence of circumstances that should cause a reasonable person to suspect the likelihood of fraud, which is not an everyday occurrence, and then requires only reasonable steps to confirm the authority of the person presenting the check to apply it to his or her own account. This duty may be met by examining documentation or possibly an explanation provided by the person presenting the check, an inquiry to the drawer, holding the check in abeyance for a brief period after notifying the drawer of its presentation, or undoubtedly other means. Whether the steps taken are reasonable may well become a jury question, but that is no different from what is required in any other negligence case.

It may well be that there are circumstances under which the presentation of a third party check would not raise suspicions in the mind of a reasonable person. But in other circumstances the likelihood of fraud will be apparent. *Sun 'n Sand* and its progeny confirm that the use of a third party check to pay one's own obligations is not the norm and in some circumstances the irregularity may be "obvious." (*Sun 'n Sand, supra,* 21 Cal.3d at p. 698.) The proper reconciliation of the principle enunciated in *Sun 'n Sand* and the demands of commerce is that when the circumstances are such that the presentation of a check by a person who is neither the drawer nor payee would cause a reasonable person to question the authority of the presenter to use the check for his or her own benefit, the duty of inquiry imposed by *Sun 'n Sand* arises. If the circumstances do not reasonably give rise to such suspicions, there is no such duty.[2]

---

[2] In *Grand Rapids Auto Sales, Inc. v. MBNA America Bank* (W.D.Mich. 2002) 227 F.Supp.2d 721, 726, the court refused to extend the holding of *Sun 'n Sand* to a situation in which a bank receives a check in payment of amounts owed on a credit card account. The court explained, "The key distinction between this case and *Sun 'N Sand* and *Allis Chalmers* [*Leasing v. Byron Ctr. St. Bank* (1983) 129 Mich.App. 602 [341 N.W.2d 837]] is that the banks in those cases actually inspected the checks and should have been alerted by the circumstances—a check drawn payable to the order of the bank by a drawer not indebted to the bank and presented by a third party seeking to negotiate the check for his own benefit—that the employee's conduct may have been improper. In other words, suspicious circumstances on the face of the checks should have alerted the banks to the potential for loss to the drawer. In contrast, pursuant to its standard procedure, [the bank] processed the [drawer's] checks without examining them.

The majority opinion states that here, in contrast to the situation in *Sun 'n Sand*, "we are presented with Neiman Marcus's acceptance of third party checks, payable to Neiman Marcus, in satisfaction of a customer's legitimate debt to the store for the purchase of goods." (Maj. opn., *ante*, at p. 492.) But the majority does not explain what is different about a bank accepting a third party check made payable to itself for deposit to the account of one who is not the maker of the check and a retail merchant accepting such a check payable to itself and depositing it to the account of one who is not the maker of the check. There is as much reason to question the authority of the person presenting the check for deposit to his or her own account in one situation as in the other. Were the presenter authorized to apply the check to his or her own account, the deposit would be "legitimate" in either case. The further statement in the majority opinion, that "there is no contention that when Young proffered the checks for payment of her accounts there was anything appearing on the checks that would lead the store cashier to question whether plaintiff also had a Neiman Marcus store account" (maj. opn., *ante*, at p. 492), discloses the fundamental error in the majority's analysis. The whole point of the holding in *Sun 'n Sand*, as well as the claim asserted in the amended complaint, is that when Young personally presented the cashier with plaintiff's checks made payable to Neiman Marcus, the fact that Young was neither the maker nor the payee of the checks *was* reason to question whether the checks were intended for deposit into her account rather than into an account that plaintiff himself may have had, and in fact did have, at the store. Neiman Marcus did "not have to be especially vigilant; its agent need only read what appears on the face of the check to be warned that a fraud may be in progress." (*Sun 'n Sand, supra*, 21 Cal.3d at p. 696.) The number and size of the checks and the personal shopper's knowledge that Young was making purchases far beyond her known means are additional circumstances that may have heightened reasonable suspicions.

The majority opinion does not explain which of the *Rowland* factors that the Supreme Court held militate in favor of recognizing a duty in this situation apply differently in the case of a retail merchant.[3] As the Supreme

[Citation.] Thus, [the bank] was not aware of any suspicious circumstances and could not have foreseen or prevented harm to [the drawer]." (*Grand Rapids Auto Sales, Inc. v. MBNA America Bank, supra*, 227 F.Supp.2d at pp. 726–727, fn. omitted.) The outcome of that case is consistent with the limited duty of inquiry recognized in *Sun 'n Sand* and the application of that duty here. The present case does not involve payment to a financial institution that mechanically processes a high volume of checks without personal contact with the person presenting the check or reason to suspect wrongdoing.

[3] The majority states that "the policy of preventing future harm and the burden to the defendant and consequences to the community do not weigh in favor of imposing a duty of inquiry in this case." (Maj. opn., *ante*, at p. 489.) Except for the burden to defendant, discussed in text, I do not understand and the majority does not explain how or why these other factors fail to militate in favor of imposing a duty. Certainly public policy favors discouraging conduct

Court made clear in *Sun 'n Sand*, "[i]t is [the bank's] *conduct* in crediting the embezzler's account with checks drawn payable to [itself] that forms the basis for relief . . . ." (*Sun 'n Sand, supra*, 21 Cal.3d at p. 693.) That conduct is precisely the same in the present case. Insofar as there is any difference between the bank in *Sun 'n Sand* and Neiman Marcus here, the difference provides greater reason for recognizing a duty of inquiry here. The plaintiff in *Sun 'n Sand* was not a depositor of the bank and had absolutely no relationship with it. Here, as Neiman Marcus could have readily determined, plaintiff was its customer and the holder of a Neiman Marcus charge account. The majority does not explain why, when presented with sizable checks drawn on the account of another person and made payable to itself, the bank in *Sun 'n Sand* but not Neiman Marcus had the duty to make a reasonable inquiry to determine if the checks were properly credited to the account of the person who presented them.

I do not suggest that under all circumstances a duty of inquiry arises upon the presentation of a third party check. That the check is presented by one who is neither the maker nor the payee is indeed one important factor that must be considered. However, the amended complaint alleges numerous additional circumstances that a reasonable fact finder could find would alert a reasonable person to the likelihood that Young had no right to apply the third party checks to her personal account. These circumstances include the size and frequency of Young's purchases in relation to her known income, the close relationship between Young and her personal shopper who encouraged and facilitated her purchases, Young's unusual practice of personally delivering to the store checks in sizable amounts on successive days, and the fact that the checks were drawn on plaintiff's personal checking account, rather than on a corporate or business account. Whether these circumstances were sufficient to cause a reasonable person to question Young's right to apply plaintiff's personal checks to the payment of her own obligations is a question of fact that plaintiff is entitled to have a jury determine.[4]

that facilitates the commission of fraud, and the community suffers to the extent that embezzlement is permitted to succeed.

[4] A similar duty is likely cognizable in actions against nonbank entities in New York. (See *Rochester & C. T. R. Co. v. Paviour* (1900) 164 N.Y. 281 [58 N.E. 114] [employer has action against individual who accepted company check from employee for unauthorized payment of employee's personal debt]; *Munn v. Boasberg* (1944) 292 N.Y. 5, 8–9 [53 N.E.2d 371] [individual defendant has duty to make inquiry of plaintiff before accepting funds where plaintiff's check is offered in payment of a third party's debt to him, and where the check gave no indication why either the individual or the third party had any right to the check proceeds]; *Shapiro v. McNeill* (1998) 92 N.Y.2d 91, 98–99 [677 N.Y.S.2d 48, 699 N.E.2d 407] ["Assuming, without deciding, that those few cases . . . where this Court has imposed a similar, strict duty of inquiry on a *nonbank* payee, are still good law after our decision in *Hartford* [*Acci. & Indem. Co. v. American Express Co., supra*, 74 N.Y.2d 153], such cases are distinguishable" on the ground that in this case "there were neither circumstances suggesting

The majority states that recognition of this qualification confuses the court's task of defining the scope of a legal duty with application of the duty to particular facts. (Maj. opn., *ante*, at p. 489, fn. 9.) Not so. The duty that follows from *Sun 'n Sand* and the other cases cited above is the duty to make an inquiry before applying to the presenter's account a third party check that the recipient should reasonably suspect has not been authorized by the maker of the check. Or, stated more generally, it is the duty to inquire before accepting for payment a third party check that one should reasonably suspect has been misappropriated. This is a determination of whether "the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].) The circumstances surrounding Young's misapplication of plaintiff's checks in this case go to whether this "particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct." (*Ibid.*, italics omitted.) *Ballard* recognizes that the court should make the former determination before the jury decides the latter question. The majority can hardly dispute that harm is foreseeable when one accepts and applies a check that he should suspect has been misappropriated. However, the majority preempts the role of the jury. It holds, in effect, that because Neiman Marcus is a retail merchant rather than a bank, the circumstances could not possibly have caused it to suspect that Young had no authority to apply to her accounts plaintiff's checks not made payable to her.

In the final analysis, it must be recognized that the majority's decision is a departure from "the fundamental principle that actors are liable for reasonably foreseeable losses occasioned by their conduct." (*Sun 'n Sand, supra,* 21 Cal.3d at p. 695.) If, under the circumstances, Neiman Marcus should reasonably have foreseen a loss to plaintiff when it applied his checks to pay Young's obligations, there is no reason why it should not bear responsibility for that loss, subject to such defenses as may apply. The majority refuses to "extend"—I would say "apply"—*Sun 'n Sand* to this situation, thus relieving Neiman Marcus of liability even if a trier of fact would find plaintiff's loss to have been entirely foreseeable, simply because Neiman Marcus is a retail merchant rather than a bank.

*Plaintiff's common law negligence claim is not displaced by the provisions of the California Uniform Commercial Code.*

Although the majority opinion does not rely on this ground, my conclusion that the demurrer should not have been sustained also requires consideration

bad faith nor the total absence of any apparent authority on the face of the checks which would put [attorney, who accepted fraudulent checks] on notice of an irregularity possibly triggering a duty to inquire"].)

of the additional argument that Neiman Marcus makes in support of the ruling, that plaintiff's common law negligence claim is displaced by the provisions of the California Uniform Commercial Code.

California Uniform Commercial Code section 1103 declares that the California Uniform Commercial Code is supplemented by "the principles of law and equity," but only if such principles are not "displaced by the particular provisions" of the code. In *Sun 'n Sand*, the court rejected the argument that a common law negligence cause of action based on the narrow duty of inquiry that it recognized was displaced by any provision of the California Uniform Commercial Code. The court reasoned that there is no specific provision intended to apply to this factual situation. Although the California Uniform Commercial Code has been amended numerous times since *Sun 'n Sand* was decided, no amendment has been directed at limiting the scope of a payee's duty when presented with a third party check.

Contrary to Neiman Marcus's suggestion, plaintiff's claim has not been displaced by California Uniform Commercial Code section 3401, subdivision (a), which provides that "[a] person is not liable on an instrument unless . . . the person signed the instrument . . . ." Neiman Marcus argues that "[s]ince the checks written by Young were forged, Burns was not liable for those charges and the bank paid those checks out of its own funds." Since the California Uniform Commercial Code "articulates a loss distribution scheme for forged drawers' signatures on checks" by placing the risk of loss on the drawer's bank, the argument continues, plaintiff's remedy was to seek recourse from his bank, which honored the forged checks, and he may not recover from Neiman Marcus, the party that merely accepted the checks and transmitted them for payment. I disagree.

Plaintiff's claim is not based on the fact that the checks Neiman Marcus accepted were forged. At least two of the means by which Young allegedly misappropriated plaintiff's money made no use of forged checks. Plaintiff alleged that some checks were presented with no signature and others were signed by plaintiff but misappropriated when Young induced Neiman Marcus to credit them to the wrong account. The claim is based on the allegation that Neiman Marcus breached a duty of care when it accepted plaintiff's checks in payment of Young's debt without inquiring as to her authority to divert the funds to the discharge of her personal obligations. (See *Sun 'n Sand, supra,* 21 Cal.3d at p. 693 ["It is [the bank's] *conduct* in crediting the embezzler's account with checks drawn payable to [the bank] that forms the basis for relief . . ."].)

For this reason, *Fireman's Fund Ins. Co. v. Security Pacific Nat. Bank* (1978) 85 Cal.App.3d 797 [149 Cal.Rptr. 883] is distinguishable. In *Fireman's*

*Fund,* an employer's insurance company, acting as the employer's subrogee, sought to recover $25,000 stolen from employer using a forged company check. When the company's bank refused to credit the stolen funds back to the company's account, the insurance company paid the employer and filed an action to recover the funds from the collecting bank. The trial court sustained the bank's demurrer without leave to amend. On appeal, the court affirmed, observing that "Fireman's is suing the wrong party. If it has a cause of action against a bank, it is not against [defendant], but against [the company's bank] for breaching its primary contractual obligation to its customer . . . and for violating its implicit duty under section 4401 to pay only checks 'properly payable.' " (*Fireman's Fund, supra,* at p. 805, fns. omitted.) The court held that any common law claim for negligence against the collecting bank was preempted by the California Uniform Commercial Code. The court distinguished *Sun 'n Sand* primarily on the ground that "the check in *Sun 'N Sand* did not involve a forged drawer's signature as did the check in question in the case at bar." (*Fireman's Fund, supra,* at pp. 813–814, 821 ["It is worth repeating that, unlike *Sun 'N Sand, supra,* 21 Cal.3d 671, our case deals essentially with payment over a forged drawer's signature, and a collecting bank's liability to the noncustomer drawer for such payment" (fn. omitted)].) The court explained that the forgery "brings into play code section 3418 [authorizing under certain circumstances the drawee of a forged check to recover the amount of the check from the person to whom or for whose benefit payment was made] which *does* articulate a loss distributive scheme that displaces an action for common law negligence." (*Fireman's Fund, supra,* at p. 814.)

*Lee Newman, M.D., Inc. v. Wells Fargo Bank* (2002) 87 Cal.App.4th 73 [104 Cal.Rptr.2d 310] is similarly distinguishable. In *Newman,* two employees fraudulently endorsed and thereby misappropriated their employer's checks, depositing the funds in their personal bank accounts. (*Id.* at p. 76.) The employer filed an action against the employees' bank, seeking to recover damages based on common law negligence. The court held that the common law negligence claim was displaced by California Uniform Commercial Code section 3405, which expressly governs the rights and liabilities of persons paying or taking an instrument bearing a fraudulent indorsement made by an employee who has been given responsibility by his or her employer for such instruments. (87 Cal.App.4th at pp. 80–81.) The court held that because the "particular provisions" of that section are controlling, the common law cause of action for negligence has been displaced.

Although California Uniform Commercial Code section 3401 would govern any claim by plaintiff against his bank for paying on the check, no provision of the California Uniform Commercial Code governs plaintiff's claim against Neiman Marcus for accepting the third party checks.

I would reverse the judgment and remand the matter for a trial to determine, among other issues, whether the circumstances were such that Neiman Marcus should have suspected that Young had no right to apply plaintiff's checks to her personal account, if so whether Neiman Marcus took reasonable measures to determine her authority to do so, and all affirmative defenses that might be raised such as plaintiff's comparative negligence and the bar of the statute of limitations.

On May 20, 2009, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 29, 2009, S173556. Corrigan, J., did not participate therein.