[No. E045969. Fourth Dist., Div. Two. Apr. 14, 2009.]

THE MEGA LIFE AND HEALTH INSURANCE COMPANY et al.,
Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
CHRISTOPHER CLOSSON, Real Party in Interest.

## Counsel

Sheppard Mullin Richter & Hampton, Andre J. Cronthall, Fred R. Puglisi, Catherine La Tempa; Weil, Gotshal & Manges, Angela C. Zambrano and Paige Montgomery for Petitioners.

No appearance for Respondent.

Stuart Law Firm, Antony Stuart and E. Glenn Anaiscourt for Real Party in Interest.

## OPINION

**RICHLI, Acting P. J.**—This case presents the question of whether real party in interest Christopher Closson (Christopher) can recover on a tort claim for fraud based on the issuance of a health insurance policy by petitioner The MEGA Life and Health Insurance Company (MEGA Life) to Christopher's deceased wife, Kathy Closson (Kathy). We hold that although Christopher properly sues as Kathy's representative to receive all damages legally available on her behalf, he has no separate and individual tort claim based on the policy. Accordingly, we will grant MEGA Life's petition and command the Superior Court of Riverside County to grant summary adjudication in favor of MEGA Life on the complaint's cause of action for fraud.

## STATEMENT OF FACTS

Most of the relevant facts are uncomplicated and undisputed. With respect to defendant MEGA Life, the first amended complaint alleges that MEGA Life misrepresented the coverage offered by its policy and concealed certain facts relevant to Kathy's decision—or, as Christopher would have it, "the decision"—to purchase the policy. The policy named her as the "primary insured" and listed her three children as covered dependents.[1] Kathy alone signed the application for the policy. The policy was allegedly touted as providing excellent benefits, equivalent to or better than those offered by Kathy's previous policy. However, it is alleged that the policy in fact provided minimal benefits, leaving Kathy's medical bills unpaid. Christopher also alleges that after Kathy's death, he was pursued by creditors and struggled to pay the medical debts.[2]

Following Kathy's death, Christopher brought the action "in his individual capacity as well as in the capacity of successor in interest." (See Code Civ. Proc., § 377.11 [defining decedent's successor in interest]; Prob. Code, § 13006 [defining successor of the decedent]; Code Civ. Proc., § 377.30 [granting to the successor the right to sue if no probate has been commenced].) There is no dispute that Christopher, as successor to Kathy, is entitled to recover most of the damages that were incurred and recoverable by Kathy.[3] The question is whether any wrongs by MEGA Life in connection

---

[1] Apparently Christopher had separate insurance.

[2] Christopher also pleaded a separate cause of action for the intentional infliction of emotional distress. However, the trial court sustained MEGA Life's demurrer to this cause of action without leave to amend.

[3] No damages for pain and suffering or emotional distress may be recovered on Kathy's behalf. (Code Civ. Proc., § 377.34; *Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 530 [61 Cal.Rptr.3d 304].) However, punitive damages would be recoverable with respect to conduct directed at Kathy. (§ 377.34.)

with the sale or issuance of the policy to Kathy give rise to an *independent* claim for injury to Christopher.

MEGA Life's motion for summary adjudication of the fraud causes of action was based on the legal premise that Christopher simply had no cause of action. In response, Christopher pointed to evidence that he had participated in the decision to select the MEGA Life policy, it was a "joint decision," and premium payments were made from community funds.

The trial court denied MEGA Life's motion for summary adjudication, opining that Christopher did have standing to seek recovery on his own behalf.

DISCUSSION[4]

A

First, we will address Christopher's argument that we should permit him to sue on his own behalf because, absent such a remedy, he will be unable to recover for the emotional distress, which he alleges MEGA Life's wrongful conduct caused him to suffer.[5] We do not agree that the point is dispositive in Christopher's favor.

■ It is often said—and is codified in California law—that "[f]or every wrong there is a remedy." (Civ. Code, § 3523.) But this statute does not create substantive rights or an unbounded right to damages. (*County of San Luis Obispo v. Abalone Alliance* (1986) 178 Cal.App.3d 848, 865 [223 Cal.Rptr. 846] (*County of San Luis Obispo*).) Instead, "[this] wholesome maxim of jurisprudence . . . can obviously have no application to any but legal wrongs or those wrongs for which the law authorizes or sanctions

---

[4] Petitioner complains that the trial court incorrectly refused to overrule its objections to portions of Christopher's declaration. The challenged portions recited that "[m]y wife and I, after discussing the information . . . reached a joint decision to apply for [the policy]," and asserted that premiums were paid either from a business account or a community account. Also, that Christopher was responsible for "hundreds of thousands of dollars" in medical bills and that he was being "pursued by various medical providers and their collection agents . . . ." In our view, Christopher could competently testify concerning conversations he had with his late wife and as to the source of premium funds, and he could certainly give evidence about the existence of medical bills and collection efforts. To the extent that the challenged paragraphs contained any "inappropriate opinions, unfounded legal conclusions, and inadmissible hearsay," MEGA Life was not harmed by the admission of such elements.

[5] The parties devote some time and energy to the argument of whether or not Christopher can even recover his emotional distress damages in a fraud cause of action. We do not reach that issue, as we focus instead on whether MEGA Life had any duty to Christopher or whether Christopher has any claim at all against MEGA Life in his individual capacity.

redress." (*Finch v. Western Nat. Bank* (1914) 24 Cal.App. 331, 338 [141 P. 261], cited in *County of San Luis Obispo*, at p. 865.) "A tort . . . involves a violation of a *legal duty*, imposed by statute, contract, or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is 'damnum absque injuria'—injury without wrong." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 6, pp. 48–49, citing *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16].) The proposition that courts should strain to provide remedies for every "wrong" in the moral sense flies directly in the face of this long-standing authority that only *legal* wrongs must be redressed.

■ California courts have explicitly rejected the concept of universal duty. " ' "It must not be forgotten that 'duty' got into our law for the very purpose of combatting what was then feared to be a dangerous delusion . . . viz., that the law might countenance legal redress for all foreseeable harm." ' " (*County of San Luis Obispo, supra,* 178 Cal.App.3d at p. 865, quoting *Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912] (*Dillon*).) Instead, whether to recognize a new "legal wrong" or "tort" is often governed by policy factors. (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8 [74 Cal.Rptr.2d 248, 954 P.2d 511].) In making these determinations, both the courts and the Legislature must weigh concepts of "public policy," as well as problems inherent in measuring loss, and "floodgates" concerns, in addition to the traditional element of foreseeability. (See *Elden v. Sheldon* (1988) 46 Cal.3d 267, 278 [250 Cal.Rptr. 254, 758 P.2d 582].)

As a result of these weighings, modern law, if not replete with examples of "wrongs" for which there are no remedies, at least offers numerous examples. Thus, although a spouse may sue for loss of consortium deriving from the injury to his or her spouse, an unmarried cohabitant may not. (Cf. *Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 404–405 [115 Cal.Rptr. 765, 525 P.2d 669]; *Elden v. Sheldon, supra,* 46 Cal.3d at pp. 277–279.) Although it is easily foreseeable that a child may suffer grievous harm when a parent is personally badly injured—similar to a spouse's loss of consortium—no recovery is allowed to a child for damages based on the immediate injury to a parent. (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 444 [138 Cal.Rptr. 302, 563 P.2d 858]; *Zwicker v. Altamont Emergency Room Physicians Medical Group* (2002) 98 Cal.App.4th 26, 32 [118 Cal.Rptr.2d 912].) And, while that same child may recover for *personal* distress if he or she witnesses the injury to the parent, a sibling who is not present at the moment of injury cannot. (See *Dillon, supra,* 68 Cal.2d. 728, and subsequent cases.)

In a relatively recent case, the Supreme Court recognized that the act of intentional spoliation of evidence is an "unqualified wrong." However, pointing out the difficult and speculative nature of proving what the destroyed evidence would have shown, and also noting the costs of meritless litigation, it declined to allow recovery in tort.[6] (*Cedars-Sinai Medical Center v. Superior Court, supra*, 18 Cal.4th at p. 17.)

Distinctions are also made with respect to the type of damages or rights that will be recognized. For example, in an action brought on behalf of a deceased plaintiff, as a rule, all appropriate damages may be recovered—but damages for pain and suffering may not. (Code Civ. Proc., § 377.34.) And as a final example, a foster child or dependent stepchild may recover for the wrongful death of a "parent," but (except in specific circumstances) they are not "heirs" with respect to inheritance from an intestate "parent." (See & cf. Code Civ. Proc., § 377.60, subds. (b), (c); Prob. Code, § 6454; *Estate of Joseph* (1998) 17 Cal.4th 203 [70 Cal.Rptr.2d 619, 949 P.2d 472], *passim*.)

Hence, it is simply not true that we are "required" to allow Christopher to sue MEGA Life for fraud in order to ensure that he can recover for his emotional distress damages. We would only be "required" to do so by existing law and precedent; if such is lacking, recognition of such a right depends on policy considerations. We therefore move on to an analysis of the existing law.

### B

In the trial court, MEGA Life relied most heavily on *Hatchwell v. Blue Shield of California* (1988) 198 Cal.App.3d 1027 [244 Cal.Rptr. 249] (*Hatchwell*), which is factually quite similar to the case at bar. In *Hatchwell*, a husband and wife sued the insurer over an alleged failure to pay medical benefits to the insured husband. The complaint contained causes of action based on contract, bad faith, breach of fiduciary duty, breach of warranty, negligence, *and* fraud. As is true here, the wife asserted that she had been part of the policy decision and that premiums were paid from community funds.

The trial court granted the defendant's motion for summary judgment against the wife on the ground of lack of standing and the Court of Appeal affirmed. It rejected the wife's arguments that her status as an "intended beneficiary," a " 'dependent beneficiary,' " or a "coinsured" gave her the right or power to sue based on the contract. (*Hatchwell, supra*, 198 Cal.App.3d at

---

[6] The court also relied heavily on the fact that the party claiming to have been injured by the "wrong" had existing remedies of both sanctions under the discovery statutes (e.g., Code Civ. Proc., § 2023.010) and evidentiary inferences against the destroying party (Evid. Code, § 413).

pp. 1032, 1034.) It also rejected the argument that the payment of premiums from community funds was a significant factor favoring relief. (*Id.* at p. 1036; see also *Austero v. National Cas. Co.* (1976) 62 Cal.App.3d 511, 517 [133 Cal.Rptr. 107] [rejecting the argument that because community funds had been used to pay policy premiums, the wife could sue for bad faith based on the insurer's denial of benefits to the contracting-party husband].)[7]

The trial court here believed that *Hatchwell* was distinguishable because Christopher sues in tort for fraud, and Christopher also argues strenuously that for this reason *Hatchwell* is not direct precedent. We do not agree. As noted above, the complaint in *Hatchwell did* include causes of action for fraud and the contract-based torts of breach of fiduciary duty and bad faith. The defendant insurer moved for summary judgment, which was granted, thus disposing of all causes of action. Although the court's opinion focuses on contract issues and language, the holding that the wife had no standing to sue necessarily applied to the tort causes of action. Under the principles of stare decisis, the trial court erred in failing to follow *Hatchwell*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455–456 [20 Cal.Rptr. 321, 369 P.2d 937]; see *Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 353 [62 Cal.Rptr.3d 796].)

■ We, of course, are not bound by the decision of a sister Court of Appeal. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 498, pp. 558–559.) But "[w]e respect stare decisis, however, which serves the important goals of stability in the law and predictability of decision. Thus, we ordinarily follow the decisions of other districts without good reason to disagree." (*Greyhound Lines, Inc. v. County of Santa Clara* (1986) 187 Cal.App.3d 480, 485 [231 Cal.Rptr. 702].) In this case, we find no reason to depart from the holding in *Hatchwell* and find the result in that case to be equally appropriate in the specific context of a tort claim for fraud.

■ We begin by examining the legal underpinnings for the conclusion that *Hatchwell* correctly reflects current California law with respect to Christopher's claim. The crucial issue in any analysis of tort liability is whether the defendant breached a duty owed to the plaintiff. The question is one of law for the court to determine. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696].) In our case, Christopher contends that MEGA Life, through its agents, breached a duty to him not to misrepresent the terms of the policy and MEGA Life's intention to provide benefits and thereby incurred liability to him. He is wrong. Christopher cannot establish the necessary element of legal reliance.

---

[7] Christopher argues that *Austero* does not apply because it involved the duty of good faith and fair dealing rather than fraud. Of course, *Austero* is not on "all fours," but that does not mean that it is of no value in determining whether the insurer owes a duty to the noncontracting spouse in circumstances, which we find legally analogous.

■ The rule is that "[e]very action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute." (Code Civ. Proc., § 367.) The elements of a cause of action for fraud are well established and not in dispute: (1) a misrepresentation or actionable concealment of fact; (2) knowledge of falsity or the duty of disclosure; (3) intent to defraud or induce reliance; and (4) actual reliance by the plaintiff. (Civ. Code, § 1709; *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 [132 Cal.Rptr.2d 490, 65 P.3d 1255].) The plaintiff must allege and prove that he actually relied upon the misrepresentations, and that in the absence of fraud, would not have entered into the contract or other transaction. (*Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 960 [23 Cal.Rptr.3d 233] (*Schauer*).)

We will assume, arguendo, that MEGA Life's agent directed his alleged misrepresentations and/or concealments at Christopher as well as Kathy, and that it was intended that both should believe them to be true. We will also assume that Christopher did in fact assume that the statements by MEGA Life's agent were true when he discussed the matter with his wife. The fatal difficulty is that Christopher was a stranger to the insurance contract, and any reliance by him could not have caused *him* to "alter his position to his injury or risk." (Civ. Code, § 1709.) Put another way, MEGA Life simply owed no duty to a person who was not the prospective party to the insurance contract.

■ We realize that it is not always necessary that a fraudulent misrepresentation be made to the intended actor. California follows section 533 of the Restatement Second of Torts in imposing liability upon the maker of a fraudulent misrepresentation to A who intends that A repeat it to B, where B is the actor and injured party. (See *Geernaert v. Mitchell* (1995) 31 Cal.App.4th 601, 605 [37 Cal.Rptr.2d 483] [seller who misrepresented facts about home defects to buyer could be liable to *subsequent* buyer if he anticipated that the misrepresentations would be repeated].) Similarly, California recognizes the rule of section 531 of the Restatement Second of Torts that a fraudulent representation intended to defraud any member of " 'the public or a particular class of persons' " may give rise to liability in favor of anyone who detrimentally relies on the representation, whether it was directly communicated or not. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 415 [11 Cal.Rptr.2d 51, 834 P.2d 745] (*Bily*) [dealing with auditor's liability to third persons who act in reliance on information in the audit report]; see also Rest.2d Torts, § 531.) But these rules are of no assistance to Christopher because it remains the injured actor-in-reliance who has cause to sue.

Insofar as Christopher argues (or at least insinuates) that his recommendations were a causative influence on Kathy's decision, we consider the point irrelevant. Indeed, the argument that Christopher's approval was somehow

legally significant sounds oddly paternalistic in this 21st century. Similarly, his assertion in the return that "he purchased" the insurance for his wife is not legally accurate. In his response to MEGA Life's "separate statement" (Code Civ. Proc., § 437c, subd. (b)(1)), Christopher asserted—or admitted—that the initial premium was paid with "community funds."[8] Nor did he purchase it "for" her. Kathy was evidently a competent adult able to contract on her own behalf, and she did so. She thereby changed her position—to her detriment, according to the allegations of the complaint—by securing health insurance from MEGA Life instead of from another company. Christopher made no application for insurance and did not receive an allegedly deficient policy or coverage. He did *not* change his legal position to his detriment.[9]

A case which we find more helpful than those upon which Christopher relies is *Schauer, supra,* 125 Cal.App.4th 949. In that case, a husband-to-be, accompanied by his fiancée, purchased an engagement ring presumably in reliance on misrepresentations as to its quality. After the couple divorced, the fiancée—now wife—sued for fraud. The Court of Appeal rejected her claim, noting that it was the *husband* who "relied on the representation and *entered into the contract of sale. . . .* [H]e retained the right, if any, to sue for actual fraud."[10] (*Id.* at p. 960, italics added.) Implicit in the latter part of the quoted statement is that it was *only* the husband who retained the right to sue; so it is here.[11]

Whichever way it is framed, under existing law the result is the same—MEGA Life simply owed no duty to be truthful to Christopher when there

---

[8] In his declaration, Christopher states that the funds were "earned by me in my business, and shared with my wife for the benefit of our family." He declares that "subsequent premium payments . . . were drawn either on a business account from a corporation owned by me, or on an account comprised of community funds." This somewhat slippery and unenlightening statement (Was it one or the other? How was the business "owned" by Christopher?) does not take away from the clear fact that the initial payment, at least, was made from community funds and through a check signed only by Kathy, which Christopher implicitly concedes.

[9] Of course, it is true that in a marital relationship, many decisions are made after the spouses jointly discuss options, advantages, and disadvantages, and many purchases may indeed be made "jointly." However, this case involves a contract expressly benefitting only one spouse, and to which only that spouse was a formal party. Our holding is, of course, limited to this situation.

[10] As indicated above, Christopher attempts to distinguish *Schauer* on the basis that he, unlike the fiancée in that case, *personally* bought the policy. But as we have explained, this is not accurate.

[11] *Schauer* approached the case from the position that the husband had not assigned his causes of action with respect to the ring to the wife when the family law court awarded the ring to the wife in the dissolution action. However, the statements in *Schauer* to the effect that it was the *actual purchaser*—the husband—who had the sole right to sue for fraud remain relevant to this case.

was no possibility that he would detrimentally change his position, and Christopher in fact did *not* take detrimental action in reliance on any fraud or concealment.[12]

■ Thus, we conclude that California law does not recognize a cause of action in Christopher with respect to the misrepresentations allegedly made by MEGA Life and/or its agent. The last question is whether we should create such a cause of action—create, that is, a duty in MEGA Life. We conclude that it is neither necessary nor advisable to do so.

### C

■ In determining whether to recognize a new tort, courts are governed by general considerations of policy (*Cedars-Sinai Medical Center v. Superior Court, supra,* 18 Cal.4th at p. 8), and we assume that the same applies to a determination whether to extend a recognized duty to new plaintiffs. We focus on whether existing law provides an adequate redress for the wrongs allegedly committed by MEGA Life.[13]

As we have stated, Christopher appears in the action wearing two hats: as Kathy's successor and in his individual capacity. Kathy, had she lived, would have had viable claims for breach of contract and fraud, which would have permitted her to recover pecuniary damages such as unrecompensed medical expenses. As noted above, the parties dispute whether emotional distress damages would be recoverable in connection with the fraud alleged here, but Kathy would at least have been eligible to pursue such damages. Thus, had Kathy lived, there can be little dispute that she could have recovered full compensation for her injury. Furthermore, she could have sought punitive damages for the fraud. (Civ. Code, § 3294, subd. (a).)

With one exception, all damages that would have been recoverable by Kathy, *including* punitive damages, may be recovered by Christopher as her successor. Insofar as he is responsible to pay her medical bills out of community property (see Fam. Code, §§ 910, 914), the payment may be

---

[12] Christopher's argument is somewhat akin to that of an agent who sues a third party because the third party's misrepresentations caused the agent to give bad advice to his principal. However, in that situation, the agent would have incurred legal detriment in reliance on the misrepresentations, because he would have run the risk of incurring tort or contract liability to his client. Kathy, obviously, would have had no redress against Christopher for any "bad advice."

[13] Although we do not rely on it as a justification for our decision, we note that claims of "reliance" by the noncontracting spouse would be easy to make and very difficult to refute, as the spousal discussions would often be private. This is a valid factor when considering whether to recognize a specific type of claim. (See *Bily, supra,* 3 Cal.4th at pp. 401–402, fn. 12.) Of course, we do not at all suggest that Christopher's assertions of reliance are not truthful.

satisfied out of the recovery he obtains on her behalf and *individual* recovery is not necessary. It is true that, as her successor, he cannot recover for her emotional distress. (Code Civ. Proc., § 377.34.) However, in our view, this does not mean that he must be allowed to recover for his own. The legislative decision that damages for physical suffering are personal and do not survive is not an "unfairness" that must be circumvented by creating a right to such damages in a surviving family member. Christopher, as Kathy's successor, can seek all damages suffered by Kathy, which the Legislature has authorized.

Furthermore, assuming that the defrauded plaintiff in a situation similar to that of Kathy could have recovered damages for emotional distress (caveat, see fn. 4), there is no compelling reason to extend a comparable right to Christopher as the spouse. Of course, it is foreseeable that one spouse may fret and suffer distress when the other is cheated out of contractual benefits—especially those relating to health care—but the whole line of cases following *Dillon, supra,* 68 Cal.2d. 728, demonstrates a judicial desire to corral liability to plaintiff A based upon a harm done to B. "[W]e will not treat the mere presence of a foreseeable risk of injury . . . as sufficient, standing alone, to impose liability . . . ." (*Bily, supra,* 3 Cal.4th at p. 399.)[14]    A spouse who is able to characterize himself or herself as a "direct victim" of tortious conduct *can* recover emotional distress damages. (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 922–923 [167 Cal.Rptr. 831, 616 P.2d 813].) But the concept of "direct victim" does not depend simply on the fact that the plaintiff was "necessarily involved" in the tort; it requires an *assumption* of duty toward the plaintiff. Thus, in *Molien,* it was not the fact that the defendant's misdiagnosis of the wife as having syphilis would "necessarily" involve her husband that allowed the latter to sue; it was that the defendant affirmatively instructed the patient to tell the husband of the diagnosis. By contrast, parents have been denied recovery for negligently inflicted emotional distress when a pharmacist erred in filling their child's prescription, because the pharmacist's duty ran solely to the patient child. (*Huggins v. Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 133 [24 Cal.Rptr.2d 587, 862 P.2d 148].)

In this case, MEGA Life accepted an obligation solely to Kathy. Its alleged misdeeds or omissions gave rise to a complete claim for relief on her behalf. MEGA Life does not dispute Christopher's right to seek such damages. No

---

[14] The *Bily* court spoke in the context of liability for negligent misrepresentations rather than fraud. We realize that the concept of foreseeability is normally a factor in determining duty in negligence actions, and that *Bily* in fact found that an auditor, while not liable for a negligent misstatement in an audit report, *could* be liable for intentional misrepresentations. We cite *Bily* only as part of our discussion over whether policy favors allowing Christopher to recover foreseeable emotional distress damages.

compelling reasons of policy require that her spouse's personal interests or role in the transaction be recognized as supporting an independent claim for additional damages.

### DISPOSITION

The petition for writ of mandate is granted. Let a peremptory writ issue, directing the Superior Court of Riverside County to vacate its order denying petitioners' motion for summary adjudication of Christopher's individual fraud cause of action and to enter a new order granting the motion.

Petitioners to recover their costs. The previously ordered stay is vacated.

Petitioners are directed to prepare and have the peremptory writ of mandate issued, copies served, and the original filed with the clerk of this court, together with proof of service on all parties.

Gaut, J., and Miller, J., concurred.

A petition for a rehearing was denied May 6, 2009, and the petition of real party in interest for review by the Supreme Court was denied June 24, 2009, S173165.