Filed 8/22/25; Modified and Certified for Pub. 8/27/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LESLIE CRUZ, | B343637 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 24STCV09276) |
| v. | |
| TAPESTRY, INC., et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Joseph M. Lipner, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, P. Craig Cardon, Tyler E. Baker and Patrick D. Rubalcava for Defendants and Appellants.

Warren Terzian, Thomas D. Warren and Dan Terzian for Plaintiff and Respondent.

———————————————

This is an appeal from an order denying a motion to compel arbitration filed by defendants and appellants Tapestry, Inc.; Kate Spade LLC; and Coach Services, Inc. (collectively, "appellants"). The trial court found appellants did not provide plaintiff and respondent Leslie Cruz with sufficient notice that by clicking a button to submit her orders for the purchase of merchandise on appellants' website, she had agreed to an arbitration clause included in the website's terms of use. A hyperlink to the terms of use was included in the following text, which notice text was in gray font and located below the button Cruz clicked to complete the online transactions on appellants' website: "BY CLICKING SUBMIT YOUR ORDER, YOU ARE AGREEING TO OUR TERMS OF USE AND PRIVACY POLICY."

Because appellants did not require Cruz to check a box or click a button stating she agreed to the terms of use and she had no reason to anticipate that purchasing the merchandise would give rise to an ongoing relationship with appellants governed by extensive contractual terms, the existence of an arbitration agreement hinges on whether appellants called Cruz's attention to the notice quoted above. We conclude that appellants failed to do so because the notice is difficult to read and far less prominent than numerous other visual elements (e.g., graphics and other text) appearing on appellants' cluttered two-column checkout pages. We thus affirm the order denying appellants' motion.

# PROCEDURAL BACKGROUND[1]

We summarize only those facts relevant to our disposition of this appeal.

### 1. *Cruz's purchases on appellants' website and her complaint against appellants*

Kate Spade LLC and Coach Services, Inc. are wholly owned subsidiaries of Tapestry, Inc. Kate Spade LLC and Coach Services, Inc. operate the "Kate Spade Outlet" website and stores for Tapestry, Inc. On February 2, 2024, Cruz placed an order on appellants' website to pick up merchandise from a Kate Spade store. On March 4, 2024, Cruz placed a delivery order on the website for additional merchandise.

On April 12, 2024, Cruz filed a complaint against appellants for unfair competition (Bus. & Prof. Code, § 17200 et seq.) and false advertising (*id.*, § 17500 et seq.). Cruz avers that at their stores and website, appellants advertise "falsely inflated" percentage sales discounts. She asserts appellants' "advertised sale reductions are misleading because . . . 'the merchandise is never (or almost never) offered for sale' " at the full price identified in their advertising. Cruz alleges her February 2, 2024 and March 4, 2024 "purchases suffered from th[is] same false advertising scheme . . . ." Cruz seeks " 'restitution and disgorgement of all unjust enrichment that

---

[1] We derive our Procedural Background in part from undisputed aspects of the trial court's order denying appellants' motion to compel and admissions made by the parties in their filings. (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 772, fn. 2 (*Association for Los Angeles Deputy Sheriffs*) [utilizing this approach].)

[appellants] obtained from [Cruz] as a result of their unlawful, unfair, and fraudulent business practices and their false advertising[.]' "

2. ***Appellants' motion to compel arbitration, the trial court's ruling thereon, and appellants' notice of appeal from that ruling***

Appellants moved to compel arbitration of Cruz's claims. As we explain below, (1) appellants rely upon an arbitration provision appearing in their website's Terms of Use, and (2) a hyperlink to the Terms of Use appears on checkout pages consumers use to purchase merchandise on appellants' website.[2]

On December 16, 2024, the trial court denied appellants' motion. Although the court acknowledged (1) the " 'Terms of Use' for [appellants'] website . . . . contain an agreement to arbitrate all claims arising from use of the website" and (2) Cruz did "not dispute that her claims arise from her use of the website," it concluded appellants "failed to establish [Cruz] assented to the arbitration agreement contained within the Terms of Use." The court stated Cruz "denies that she consented to the arbitration

---

[2] During the trial court proceedings, appellants submitted a declaration from the vice president of North America Marketing and E-Commerce for the Kate Spade New York brand, wherein the official declared, "The phrase 'Terms of Use' [on the two checkout pages at issue] was an underlined hyperlink to the Terms of Use . . . that, if clicked, caused the browser to open the Terms on the Website." The Terms of Use in effect at the time Cruz purchased the merchandise contained approximately eight pages of small, single-spaced text covering various matters, including ownership of the site's content, limitations on liability, indemnification, copyright notices, and arbitration.

4

agreement that appears in the Terms of Use," and the court then analyzed appellants' website in detail.

First, the trial court observed that to complete a pick-up order, "a user navigates through several payment screens, arriving finally at a large pink button with prominent white lettering reading 'PLACE MY ORDER >>[.]'[ ] [Citation.] Immediately underneath the button, there is a line of gray text less than a quarter of the button's size and much smaller than the words 'PLACE MY ORDER.' [Citation.] That text reads, 'BY CLICKING SUBMIT YOUR ORDER, YOU ARE AGREEING TO OUR TERMS OF USE AND PRIVACY POLICY.' [Citation.] While these words are in all caps, they are in a small font. The words 'terms of use' and 'privacy policy' are underlined because they are hyperlinks. [Citation.] However, neither hyperlink is highlighted in a different color from the surrounding text."

The trial court noted that the webpage used to complete delivery orders is "very similar" to the one provided for pick-up orders "except that the large pink button says 'FINAL: PLACE ORDER>,' a slightly different wording."

For clarity and consistency, we refer to the two webpages containing the notice at issue as "checkout pages."[3] As shorthand, we refer to the text "BY CLICKING SUBMIT YOUR ORDER, YOU ARE AGREEING TO OUR TERMS OF USE AND PRIVACY POLICY" as the "notice text," and we refer to the large pink button a consumer must click to complete the transaction as the "action button."

---

[3] Appendix A to this opinion contains the screenshot for the checkout page for pick-up orders, and Appendix B contains the screenshot for delivery orders.

In concluding the notice text on these two checkout pages was "not sufficiently conspicuous to create a binding agreement under California law," the trial court explained, "As a result of [appellants'] graphic design decisions, the web page draws the user's eye to the pink 'PLACE MY ORDER' or 'FINAL:  PLACE ORDER' button and in no way directs the user to the small text below that button relating to the terms of use.  Apart from the underlining, the monochromatic text about terms of use contains no sign of a hyperlink.  There are no contrasting colors to draw the user's attention.  There is no pop-up window with scrollable text [containing the Terms of Use].  There is nothing conspicuous about the small text at issue that would put the user on notice."

The trial court further noted the checkout pages "contain[ ] other information for the user to review that is less prominent than the pink 'PLACE MY ORDER' or 'FINAL:  PLACE ORDER' button but more prominent than the small-font sentence about the terms of use," to wit, the "portions of the . . . page[s] relating to entering credit card information, pricing information, offers about DIY gift wrap kits, and contact information for Kate Spade stylists."

As for the context of the transaction, the trial court stated that appellants' "website involves purchases of goods, not an involved ongoing commercial relationship, thus making it less likely that a user would expect complex contract terms."

Because the trial court found appellants had not shown the existence of an agreement to arbitrate Cruz's claims, it did not address (1) appellants' argument the arbitration agreement delegates to the arbitrator sole authority to determine the scope of the arbitration agreement; and (2) Cruz's contention the arbitration agreement is unenforceable "because it does not

6

permit [her] to seek public injunctive relief if the dispute is referred to arbitration."

Appellants timely appealed from the order denying their motion to compel arbitration.[4]

## APPLICABLE LAW REGARDING ENFORCEMENT OF ARBITRATION AGREEMENTS

" 'In ruling on a motion to compel arbitration, the trial court shall order parties to arbitrate "if it determines that an agreement to arbitrate the controversy exists . . . ." [Citation.] "[T]he party seeking arbitration bears the burden of proving the existence of an arbitration agreement by a preponderance of the evidence, and the party opposing arbitration bears the burden of proving by a preponderance of the evidence any defense . . . ." [Citation.]' " (*Western Bagel Co., Inc. v. Superior Court* (2021) 66 Cal.App.5th 649, 662.)

" ' "[G]eneral principles of [our state's] contract law determine whether the parties have entered a binding agreement to arbitrate." ' [Citation.] 'Mutual assent, or consent, of the parties "is essential to the existence of a contract" [citations], and "[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense" [citation]. "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." ' [Citations.]" (See *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931, 943 &

---

[4] (See Code Civ. Proc., § 1294, subd. (a) ["An aggrieved party may appeal from: [¶] . . . An order dismissing or denying a petition to compel arbitration."].)

7

fn. 7 (*Blizzard Entertainment, Inc.*).)[5]  Put differently, " 'notice—actual, inquiry, or constructive—is the touchstone for assent to a contract[.]' " (*Blizzard Entertainment, Inc.*, at p. 944.)

"These consent principles apply 'with equal force to arbitration provisions contained in contracts purportedly formed over the Internet.' [Citations.]  'While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that " '[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract.' " ' [Citation.]" (*Blizzard Entertainment, Inc., supra,* 76 Cal.App.5th at p. 943.)  " '[W]hen transactions occur over the internet, there is no face-to-face contact and the consumer is not typically provided a physical copy of the contractual terms. . . .' [Citations.]  . . . '[I]n order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button.' [Citation.]" (*Id.* at p. 944.)

" '[B]ecause the threshold issue of the existence of a contract is for the courts to decide, the issue of conspicuousness is typically characterized as a question of law.' [Citation.]  But in deciding this issue, courts are actually undertaking 'a fact-intensive inquiry' of 'largely subjective' criteria, such as the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen 'clutter.' [Citation.]"

---

[5] Appellants concede, "for the purposes of this case only, that California law applies to the question of whether an arbitration agreement exists between [appellants] and Cruz."

8

(*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at pp. 946–947.)

" '[P]roviders[ of goods and services] . . . have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online[.]' . . . . [Citation.]" (*Weeks v. Interactive Life Forms, LLC* (2024) 100 Cal.App.5th 1077, 1088.) " '[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' [Citation.]" (*Id.* at p. 1086.) "Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." (See *Berman v. Freedom Financial Network, LLC* (9th Cir. 2022) 30 F.4th 849, 855–857 (*Berman*) [applying California law].)[6] "[A] webpage must take steps 'to capture the user's attention and secure [his or] her assent [to the terms at issue],' " instead of utilizing a design that "draw[s] the user's attention away from" notice of those terms. (See *Berman*, at p. 857; see also *id.* at p. 858 [noting that a website must "adequately call to [the consumer's] attention . . . the existence of the terms and conditions"].)

---

[6] " '[W]hile decisions of federal courts in matters of state law are not binding on state courts, they may be persuasive [citations.]' [Citation.]" (*Brakke v. Economic Concepts, Inc.* (2013) 213 Cal.App.4th 761, 770.)

9

## DISCUSSION

As explained below, we agree with the trial court that appellants failed to show that an agreement to arbitrate was formed when Cruz purchased goods through their website in February and March 2024. Given our conclusion, we do not address Cruz's contention that the agreement is unenforceable because it unlawfully prohibits her from seeking public injunctive relief in any forum. Before determining whether appellants provided Cruz with reasonably sufficient notice of the arbitration clause contained in the Terms of Service, we address the applicable standard of review.

## A.     Our Standard of Review Is De Novo

" 'Under traditional contract principles, where there is no dispute as to the material facts, "the existence of a contract is a question [of law] for the court to decide." [Citation.] Where . . . the trial court denies a petition to compel arbitration based on the threshold issue of the existence of a contract, and the evidence of the alleged contract formation consists primarily of undisputed screenshots of the website at issue, our review is de novo.' [Citations.]" (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 949.) Because the trial court's denial of appellants' motion to compel arbitration was predicated on its analysis of screenshots of the checkout pages, we review the court's decision de novo.

Cruz questions whether our review is de novo. She claims *Martinez v. BaronHR, Inc.* (2020) 51 Cal.App.5th 962 (*Martinez*) and *Bannister v. Marinidence Opco, LLC* (2021) 64 Cal.App.5th 541 (*Bannister*) indicate that "[f]act-intensive determinations as to whether the parties agreed to arbitrate are reviewed under a

10

substantial evidence standard." (Citing *Martinez*, at p. 966; *Bannister*, at pp. 544–545.) Cruz also directs us to an excerpt from the *Bannister* decision in which the Court of Appeal observed, "[S]ome courts have held that '[w]hen . . . the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the question for the reviewing court is whether that finding is erroneous as a matter of law.' [Citation.]" (*Bannister*, at p. 545, fn. 1.)

*Martinez* found the substantial evidence standard governed whether a trial court erred in denying a motion to compel arbitration based on an employee's testimony he did not intend to waive his right to a jury trial when he signed, but did not initial, an arbitration agreement. (See *Martinez*, *supra*, 51 Cal.App.5th at pp. 964–966.) *Bannister* applied the substantial evidence standard to review an order denying a motion to compel arbitration in a case in which the parties offered "conflicting evidence" regarding whether an employee electronically signed an arbitration agreement. (See *Bannister*, *supra*, 64 Cal.App.5th at pp. 544–547.) The *Bannister* court also noted in passing that certain decisions suggested the " 'erroneous as a matter of law' " standard was applicable, but the Court of Appeal declined to resolve that issue because "the outcome [was] the same" there under either that standard or substantial evidence review. (See *Bannister*, at p. 545, fn. 1.) Neither *Martinez* nor *Bannister* undermines our conclusion that we review de novo whether the undisputed screenshots of appellants' checkout pages establish that Cruz agreed to submit her claims to arbitration.

" 'Even when our review on appeal "is de novo, it is limited to issues which have been adequately raised and supported in

11

[the appellant's opening] brief.  [Citations.]  Issues not raised in an appellant's brief are deemed waived or abandoned." ' [Citation.]  To succeed[,] . . . [an appellant] must first establish error. . . .  ' "[T]he most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct." [Citation.]  It is the appellant who bears the burden of overcoming that presumption.' [Citation.]"  (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555, first alteration in original (*Golden Door Properties, LLC*).)  To "rebut[ ] the presumption of correctness accorded to the trial court's decision," the appellant must " ' " 'supply[ ] the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "  [Citation.]'  [Citations.]" (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 776–777.)

## B.      Appellants Did Not Alert Reasonably Prudent Internet Consumers That Purchasing Appellants' Products Would Bind Consumers to the Terms of Use

Appellants argue that when Cruz pressed the action button to complete her purchases of merchandise in February and March 2024, she was consenting to the Terms of Use, including the arbitration provision contained in that document.  Because appellants employed a type of contract formation identified by case law as a "sign-in wrap" agreement and Cruz had no reason to expect she would be entering into an ongoing contractual relationship with appellants, appellants needed to design their checkout pages in a manner that would call her attention to the notice text.  By placing the notice text in barely readable gray font smaller than many of the other more prominent elements of the two-column checkout pages, appellants failed to give Cruz

12

reasonable notice that clicking the action button would bind her to the Terms of Use.

### 1. The trial court correctly found appellants utilize a "sign-in wrap" agreement

" 'Most courts . . . have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms:  browsewraps, clickwraps, scrollwraps, and sign-in wraps.' [Citation.]" (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 945.)  Generally, "browsewrap [agreements] provid[e] the least" amount of notice whereas "scrollwrap [agreements] provid[e] the most." (See *id.* at p. 946.)  Although these designations are relevant in assessing whether notice of an agreement is sufficiently conspicuous to bind consumers (see *ibid.* [noting that "[t]he 'wrap' methods of online contract formation provide varying degrees of notice to users"]), "it is the degree of notice provided, not the label, that is determinative" (see *id.* at p. 950).

" ' "A 'browsewrap' agreement is one in which an internet user" ' "  " ' " 'gives his [or her] assent simply by using the website,' " ' ' which typically contains a hyperlink somewhere on the page leading to a separate page containing the terms of use to which the owner intends to bind the user." (See *Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 945, italics omitted.)  " ' "[A] 'clickwrap' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." ' [Citation.]" (*Ibid.*, italics omitted.)  " ' "A 'scrollwrap' agreement is like a 'clickwrap,' but the user is presented with the entire agreement and must physically scroll to the bottom of it to

find the 'I agree' or 'I accept' button . . . ." ' [Citation.]" (*Ibid.*, italics omitted.)

" 'Sign-in wrap agreements . . . include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an "I agree" button. Instead, the consumer is purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to "sign in" or "sign up" for an account.' . . . [Citation.]" (*Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 946.)

Here, the trial court ruled appellants utilize "a form of 'sign-in-wrap' agreement . . . ." Because appellants maintain that consumers who click the action button to purchase merchandise are bound by the Terms of Use, we agree with the trial court that they employ a sign-in agreement. Because " ' "the consumer's assent [to this type of agreement] is 'largely passive,' " . . . *the existence of a contract turns* " '*on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue.*' " ' [Citation.]" (See *Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 946.) We turn to that question now.

### 2. *We reject appellants' argument that because of the nature of the transaction, Cruz should have been looking for the Terms of Use*

Before assessing the visual elements of the two checkout pages, we evaluate " 'the transactional context' " because it " 'is key to determining the expectations of a typical consumer.' [Citation.]" (See *Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 947; see also *id.* at p. 950 [indicating this

14

factor assists courts in "fram[ing their] evaluation of the sufficiency of [web] notices"].) Thus, " 'when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship,' such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer 'is less likely to be looking for' contractual terms." (*Id*. at p. 947, quoting *Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 476 (*Sellers*).) According to appellants, because Cruz "purchased expensive apparel items sight unseen," that is, "a pair of $79.00 shoes" on February 2, 2024 and "nearly $150.00 of merchandise on March 4, 2024," this is a case "in which a consumer would . . . likely . . . be look[ing] for terms (such as a return policy) that could govern."

Appellants misapprehend the nature of the inquiry into the transactional context. Courts focus on whether the typical consumer completing the transaction would " 'anticipate . . . enter[ing] into an ongoing relationship governed by extensive contractual terms' " such as the Terms of Use at issue here. (See *Blizzard Entertainment, Inc., supra*, 76 Cal.App.5th at pp. 950–951; fn. 2, *ante* [explaining that the Terms of Use consists of lengthy terms].) An online purchase of merchandise does not necessarily give rise to a consumer expectation of an ongoing relationship governed by extensive contractual terms. (See *Blizzard Entertainment, Inc.*, at pp. 947, 950–951.) Indeed, one would expect the purchase of a single flower arrangement or pair of socks to be subject to a return policy as well, yet, as noted above, they are examples of transactions in which a typical consumer would not expect to be entering into such a relationship with the seller. (See *id*. at p. 947.) Furthermore, it is not

15

apparent that the dollar amounts of Cruz's purchases placed her on notice that she was entering into an ongoing contractual relationship.

Appellants cite an unpublished federal district court decision for the proposition that the mere " '[p]urchas[e of] a product . . . contemplates "some sort of continuing relationship," especially as it would relate to the purchase itself.' " (Quoting *Nail v. Lens.com* (C.D.Cal. June 20, 2024, No. 2:24-cv-02531-SB-E) [2024 WL 3723912 at p. *4] (*Nail*).) The *Nail* court made these remarks in finding that a plaintiff who purchased contact lenses from an online retailer agreed to a forum selection clause included in the retailer's terms of use, a hyperlink to which appeared on the retailer's checkout page. (See *Nail*, at pp. *1, *4–5.) Insofar as *Nail* may be read to hold that the online purchase of a product always gives rise to a continuing relationship in which the typical consumer should expect to be bound by extensive contractual terms, we respectfully disagree. Our analysis above demonstrates that such an expansive holding contravenes state appellate case law with which we agree regarding the reasonable expectations of consumers who purchase goods online. (See *Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 769 ["We are not bound by federal district court decisions . . . ."]; *The MEGA Life & Health Ins. Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1529 [" '[W]e ordinarily follow the decisions of other districts [of our state's court of appeal] without good reason to disagree.' "].)

Lastly, appellants assert, "Cruz's actual relationship to [appellants] and their websites (*e.g.*, numerous purchases over the course of years, creation of customer accounts) underscores that the context of Cruz's purchase transactions 'support a

16

finding that the notice is conspicuous.' [Citation.]" (Quoting *Nail, supra,* [2024 WL 3723912 at p. *5].) Aside from quoting this language from the unpublished *Nail* decision, appellants fail to explain what relevance Cruz's "numerous purchases" and creation of customer accounts have on whether she had sufficient notice of the Terms of Use during her online purchases in February and March 2024. For instance, appellants do not claim that by previously visiting their websites on several occasions, Cruz attained actual notice of the Terms of Use. Accordingly, appellants forfeited their contention that "Cruz's actual relationship to [appellants] and their websites" supports a finding that an agreement to arbitrate exists. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 162 [holding that an appellant forfeited an argument by citing an authority without " 'explain[ing] how it applie[d] in [that] case' "].)

> **3. Although the capitalized notice text is just below the action button and the hyperlinked phrase "<u>TERMS OF USE</u>" is underscored in the notice, other visual elements on the checkout pages direct the user away from the barely legible gray notice text**

Appellants argue their checkout pages provided reasonable notice to consumers that they would be bound by the Terms of Use if they clicked the action button. In support of their position, appellants repeatedly emphasize that the notice text is "*directly below*" the action button, the phrase "<u>TERMS OF SERVICE</u>" is underscored in the notice text, and all text in the notice is capitalized.

17

As a preliminary matter, appellants fail to account for a critical aspect of each checkout page—the notice text is but one element in the left column of a two-column webpage. The right column on both pages contains an itemization of the costs of the product (e.g., the subtotal and estimated tax) and several other visual elements discussed in greater detail below. This two-column layout on each checkout page increases the likelihood that a consumer would miss the notice text included in just one of the two columns. Yet, appellants not only overlook the importance of this aspect of the checkout pages' design, they omit the right column from all screenshots of the checkout pages they reproduce in their briefing.

Next, we acknowledge that the notice text is just below the action button, both of which are on the bottom of the left column and set apart from the remainder of each checkout page; the notice text is capitalized; the phrases "TERMS OF USE" and "PRIVACY POLICY" are underscored; and the version of the notice text found on the checkout page for pick-up orders is about three-quarters of the size of the white "PLACE MY ORDER >>" text included in the pink action button. Nevertheless, other aspects of the notice text and the action button deemphasize the conspicuousness of the notice text. Specifically, the notice text on the delivery order checkout page is only approximately half the size of the action button's white text; on both checkout pages, the white text of the action button is far easier to see than the gray notice text because the white action button text is against a bright pink background whereas the gray notice text is against an off-white background, requiring the reader to squint to discern the notice text's content; and, as the trial court observed, the notice text is less than a quarter of the size of the action button.

The trial court also correctly found the notice text is less prominent than many other elements of the checkout pages, including the areas "relating to entering credit card information, pricing information, offers about DIY gift wrap kits, and contact information for Kate Spade stylists." For instance, the "**DIY Gift Wrap Kit**" advertisement in the right column of each checkout page appears in boldface black font that is at least twice the size of the notice text, and is accompanied by a graphic of what appears to be a present and additional text inviting consumers to learn more about this offer. Similarly, the right column of each page also contains, inter alia: in boldface black text nearly three times the size of the notice text, the phrase "**Our Stylists Are Here to Help**"; a customer service telephone number accompanied by a drawing of headphones; the words "Leave Us a Message" accompanied by an envelope graphic, and the phrase "Shipping and Returns" with a drawing of a box just above it. Although other parts of the checkout pages also use graphics or text in colors other than gray to draw a consumer's attention to them (e.g., the option to use "PayPal" insignia is in two shades of blue, and the amount the consumer allegedly saved on this order is in boldface red characters), those features are absent from the notice text.

Appellants counter that the notice text is "rendered in a size that is virtually the same as, if not the same as (or larger than), the font size used throughout the webpage including, for example, the font used to denote information necessary to complete the transaction (*e.g.*, 'Card Number,' 'Address')."[7]

---

[7] In their reply brief, appellants argue for the first time "the notice text is *larger* than the allegedly false 'Comparable

19

Although we agree the font size of the notice text is roughly the same size as the labels for the "Credit Card Number" and "Address" fields on the checkout page for pick-up orders, the notice text is approximately half the size of the text in the fields for information to be entered in the check-out page for delivery orders. Significantly, the labels for these fields appear in a graphic comprised of several boxes, and appellants acknowledge the transaction cannot be completed unless the consumer provides the information requested in those fields. Whereas appellants have utilized a graphical interface to ensure a consumer supplies billing information, they have not done the same to alert a consumer to the Terms of Use (e.g., by requiring a consumer to check a box next to the notice text).

In light of the degree of clutter on the two-column checkout pages and the conspicuousness of the pages' other elements in relation to the notice text, we reject appellants' assertion that, "given its proximity [to the action button], [the notice text] would be impossible to miss." Instead, we conclude appellants designed their checkout pages in a manner that "draw[s] the user's attention away" from the gray, difficult to read, notice text. (See *Berman*, *supra*, 30 F.4th at p. 857.)

Value' advertising upon which Cruz allegedly relied [that] is the basis of her claims" that appellants misled consumers as to merchandise sales discounts. Although appellants do not elaborate further on the " 'Comparable Value' advertising" to which they refer, they seem to be alluding to a price quoted on a webpage other than the two checkout pages at issue. Appellants forfeited this argument by failing to raise it in a timely fashion. (See *Golden Door Properties, LLC*, *supra*, 50 Cal.App.5th at pp. 482, 518 [concluding that an appellant "forfeited [a] point" "[b]y not raising [it] in [the] opening brief"].)

Appellants argue their checkout pages are similar to an online checkout page for the purchase of sporting goods that the Ninth Circuit Court of Appeals found to have provided sufficient notice of an arbitration agreement. (Citing *Patrick v. Running Warehouse, LLC* (9th Cir. 2024) 93 F.4th 468, 477 (*Patrick II*).) Appellants direct us to a screenshot of part of the checkout page from the *Patrick* matter that displays a green button with the white letters "Place Order" therein and smaller text underneath the button that states: "By submitting your order you confirm you are 18 years of age or older and agree to our privacy policy and terms of use." (Citing *Patrick v. Running Warehouse, LLC* (C.D.Cal. Oct. 18, 2022, No. 2:21-cv-09978-ODW (JEMx)) [2022 WL 10584136, at p. *2] (*Patrick I*) [excerpt from the underlying federal district court decision reviewed by the Ninth Circuit, wherein the district court reproduced a portion of the checkout page for the Running Warehouse site], affd. (9th Cir. 2024) 93 F.4th 468.) In the screenshot, the words "privacy policy" and "terms of use" are in green font, whereas the remainder of the notice is in black font. (See *Patrick I, supra,* [2022 WL 10584136, at p. *2].)

The green font used for the terms "privacy policy" and "terms of use" in the screenshot from the *Patrick* matter differentiates that text from the remainder of the black text notice in a manner more effective at capturing a consumer's attention than appellants' decision simply to underscore those terms in the instant, entirely gray, notice text on their checkout pages. (See also *Berman, supra,* 30 F.4th at p. 857 [indicating that in some cases, "[s]imply underscoring words or phrases" may be "insufficient to alert a reasonably prudent user that a clickable link exists"].) Also, the screenshot from the *Patrick* case does not

21

indicate that the notice appeared on a two-column webpage, or that there were graphics or other visual elements that could draw a consumer's eyes away from the notice.  (See *Patrick I*, *supra*, [2022 WL 10584136, at p. *2].)  In short, the font color and lack of screen clutter shown in the screenshot from *Patrick* belie appellants' argument that it is "nearly indistinguishable from" appellants' checkout pages.[8]

Appellants' reliance on *Slaten v. Dick's Sporting Goods, Inc.* (C.D.Cal. Feb. 2, 2024, No. 2:23-cv-04861-WLH-MAA) [2024 WL 1136399], an unpublished federal district court decision, fares no better.  Appellants (1) assert the *Slaten* court found that a "notice on a retailer's checkout webpage was sufficient to create an arbitration agreement"; and (2) embed in their opening brief an

_____

[8] Given the Ninth Circuit's observation that "key information such as the purchase total" also appeared on the webpage in that case (see *Patrick II*, *supra*, 93 F.4th at p. 477), it seems that the screenshot upon which appellants rely does not depict the entirety of the page.  Furthermore, the *Patrick II* decision does not contain a screenshot of the webpage.  (See *ibid.* [describing the webpage but not including a screenshot thereof]). In an attempt to provide us with a fuller picture of the webpage, appellants direct us to an excerpt from an answering brief filed on appeal in *Patrick II* that reproduces what appear to be screenshots of the page.  Although this court granted appellants' request for judicial notice of the answering brief because it is a court filing (see Evid. Code, §§ 452, subd. (d), 459), we do not consider the screenshots from that brief because, as appellants correctly note in their reply, "[i]mages in a brief are not evidence" (see also *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 [noting that " 'unsworn averments in a memorandum of law prepared by counsel do not constitute evidence' " upon which an appellate court can rely].)

image from the case showing only an orange button with the white letters "PLACE ORDER" therein and the following smaller black text underneath: "By placing the order, I agree to the Terms Of Use & Privacy Policy." (Citing *Slaten*, *supra*, 2024 WL 1136399, at pp. *2, *4.) This screenshot embedded in appellants' brief does not show that the checkout page contains two columns or has any visual elements that could distract the consumer from the notice of contractual terms. Furthermore, the black text for the notice is darker and easier to read than the gray notice text on appellants' checkout pages. Accordingly, *Slaten* is not apt, and, as noted earlier, we are not bound by an unpublished federal district court decision.

In sum, appellants did not design their checkout pages in a manner that provides reasonably prudent internet consumers with sufficient notice that clicking the action button would bind them to the Terms of Service. In light of that conclusion, we do not address appellants' argument their checkout pages are distinguishable from the webpages in *Berman* and *Sellers* that fell short of satisfying the reasonably conspicuous notice standard. (See *Chabolla v. ClassPass, Inc.* (9th Cir. 2025) 129 F.4th 1147, 1155 [" '[T]he [reasonably conspicuous notice] inquiry has always been context-and fact-specific.' "]; *Blizzard Entertainment, Inc.*, *supra*, 76 Cal.App.5th at p. 947 [characterizing the analysis as " 'a fact-intensive inquiry' " hinging on various "criteria, such as the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen 'clutter' "].)

## DISPOSITION

We affirm the trial court's December 16, 2024 order denying appellants' motion to compel arbitration.  Respondent Leslie Cruz is awarded her costs on appeal.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



M. KIM, J.

# APPENDIX A



# APPENDIX B



Filed 8/27/25

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| LESLIE CRUZ, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TAPESTRY, INC., et al., <br><br> Defendants and Appellants. | B343637 <br><br> (Los Angeles County Super. Ct. No. 24STCV09276) <br><br> CERTIFICATION AND ORDER FOR PUBLICATION; ORDER MODIFYING OPINION <br><br> [NO CHANGE IN JUDGMENT] |


THE COURT:

A.  *Certification and Order for Publication*

The opinion in the above-entitled matter filed on August 22, 2025, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

B.  *Order Modifying the Opinion*

The opinion is also modified as follows:

On page 14 of the opinion, in the second sentence of the second full paragraph, we replace the sentence reading, "Because appellants maintain that consumers who click the action button to purchase merchandise are bound by the Terms of Use, we agree with the trial court that they employ a sign-in agreement[,]" with the following sentence: "Because appellants maintain that consumers who click the action button to purchase merchandise are bound by the Terms of Use, we agree with the trial court that they employ a sign-in wrap agreement."

The modification does not constitute a change in the judgment.

CERTIFIED FOR PUBLICATION.

_____
ROTHSCHILD, P. J.        BENDIX, J.        M. KIM, J.